(121 App. Div. 335.)

### MOORE v. MUTUAL RESERVE FUND LIFE ASS'N.

(Supreme Court, Appellate Division, Third Department. September 11, 1907.)

1. INSURANCE—CONTRACT—RESCISSION—GROUNDS—FRAUD.

An assessment life insurance company concealed from an applicant for a policy a contingent liability of $523,000, and reported a different contingent liability of $570,000. The company gave itself credit to the extent of funds which would be collected on a subsequent assessment as an offset against the reported liability, while, in fact, the contingent asset was only applicable to the liability concealed. *Held*, a concealment of a material fact, authorizing the insured to rescind.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 28, Insurance, § 534.]

2. SAME.

A policy accepted by insured through the fraud of the insurer is voidable ab initio at the election of insured.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 28, Insurance, § 534.]

3. CONTRACTS—RESCISSION—CONDITIONS PRECEDENT—RESTORATION OF PROPERTY RECEIVED.

One rescinding a contract on the ground of fraud must restore to the other party the property received under it, and which he has under his control at the time he elects to rescind, and, if he cannot restore the property, he must restore the value thereof.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 11, Contracts, § 1186.]

4. INSURANCE—CONTRACT—NATURE.

Under a contract of life insurance, insured has not received at any specified time any definite value which he must return on rescinding the policy.

**5. SAME—RESCISSION—RECOVERY OF PREMIUMS PAID.**

One rescinding a policy on his life for fraud of the insurer may recover the premiums paid without deductions therefrom for benefits enjoyed, or for expenses to the insurer in carrying the insurance.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 28, Insurance, §§ 457, 536.]

**6. APPEAL—DISPOSITION OF CAUSE—MODIFICATION.**

Where the trial court found the amount to which a party was entitled, but erroneously refused to render judgment for the proper amount, the court on appeal will direct judgment for the correct amount, instead of ordering a new trial.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 3, Appeal and Error, §§ 4507–4512.]

Kellogg, J., dissenting, and Chester, J., dissenting in part.

Cross-Appeal from Trial Term, Chemung County.

Action by John Moore against the Mutual Reserve Fund Life Association. From a judgment granting insufficient relief, both plaintiff and defendant appeal. Modified and affirmed. ,

In February, 1892, the plaintiff took out a policy of life insurance in the defendant company for the sum of $10,000. In 1906, claiming that policy was procured by fraudulent representations, he claimed the right to rescind the contract, offered back the policy, and demanded a return of the premiums paid, with interest. Upon the refusal of the company to return the premiums, he brought this action in equity to be allowed to rescind and to recover back the premiums paid. The trial judge has found that the contract was induced by the defendant by false representations of material fact upon which the plaintiff relied, and authorized its rescission. The court has further found that the mortuary cost of said policy from February 12, 1892, to January 2, 1906, was $1,526.72, that the total expenses during the same period were $728.42, and the interest on said sums to June 30, 1906, $983.15, making a total of $3,238.29. The court has further found that the premiums paid to said company amounted to $2,437.10, and that interest on said payments so made amounted on June 30, 1906, to the sum of $1,093.24, making a total of $3,530.34. The difference between this and the aforesaid sum of $3,238.29, to wit, the sum of $292.05, is the amount for which judgment has been directed.

The plaintiff has appealed, contending that he is entitled to the repayment of all premiums paid, with interest, without deduction for either the mortuary costs or the expenses on said policy. The defendant has appealed, contending that plaintiff is not entitled under the evidence to a rescission of the contract. Further facts appear in the opinion.

Argued before SMITH, P. J., and CHESTER, KELLOGG, COCHRANE, and SEWELL, JJ.

John F. Murtaugh, for plaintiff.
Sewell T. Tyng (James J. Farren, of counsel), for defendant.

SMITH, P. J. The finding of fraud by the trial judge is stoutly challenged by the defendant. That finding is based upon the concealment by the defendant from the plaintiff, both in a personal interview and in its public report, of the existence of a contingent liability of $523,000 for death losses upon the 1st day of January, 1892. This liability was for losses of which defendant had been notified, in which, however, the proofs of loss had not been filed. The contention of defendant as to this concealment is twofold: First, that this sum was included in an estimated contingent liability of $570,000. Upon an

examination of the evidence, we are satisfied that the trial court was fully justified in holding that the item of $570,000 reported for contingent liability included simply liability for policies maturing within two months after January 1st, and was not intended to include liability for deaths occurring prior thereto of which defendant had been notified, but of which no proofs had been made. Defendant further contends that, if it be assumed for the argument that this contingent liability was concealed, nevertheless, as this liability could only be paid out of and to the extent of the funds collected upon the next assessment, the company was entitled as an offset to that liability to a credit of contingent assets of equal amount, and that, therefore, the concealment was not of a material fact which could have influenced the making of the contract. This contention would not be without force, were it not for the fact that the company has practically given itself credit for this contingent asset as an offset against the reported contingent liability of $570,000, while, in fact, such contingent asset could not be applied as an offset to that contingent liability of $570,000, because it was required to pay the contingent liability of $523,000 which was concealed. Without discussing in further detail the merits of defendant's appeal we are content with the finding of fraud by the trial judge, and with the legal conclusion drawn therefrom.

If, therefore, the issuance of this policy was induced by fraudulent representations on the part of the defendant, such policy was thereafter voidable ab initio at the instance of the plaintiff, and the question then arises as to the amount of his recovery; he claiming the full amount of the assessments paid, with interest, and defendant contending that such total amount should be reduced by the cost to it of the insurance protection heretofore afforded plaintiff under the policy which he now seeks to rescind. Both parties invoke the statu quo doctrine. The plaintiff argues that he now has in his possession nothing whatever of value resulting from this contract of insurance; while the defendant urges that plaintiff has received under the contract a benefit equivalent to the cost to the company of carrying the policy for the period in question, and that its position has been altered by reason of such cost, which should, therefore, be refunded to it by the plaintiff if any recovery for assessments is to be allowed.

The rule has been stated as follows:

"The party who would disaffirm a fraudulent contract must return whatever he has received upon it. This is on a plain and just principle. He cannot hold on to such part of the contract as may be desirable on his part, and avoid the residue, but must rescind in toto, if at all." Masson v. Bovet, 1 Denio, 68, 74, 43 Am. Dec. 651.

"The law not only requires a disaffirmance of the contract at the earliest possible moment after discovery of the cheat, but a return of all that has been received under it, and a restoration of the other party to the condition in which he stood before the contract was made." Cobb v. Hatfield, 46 N. Y. 533, 537.

"It is undoubtedly a general rule of law that a party who would rescind a contract upon the ground of fraud must act promptly and restore, or offer to restore, to the other party what he received under it. But this rule only means that he must restore what he himself has received, and has by force of the contract under his own control." Hammond v. Pennock, 61 N. Y. 145, 152, 153.

"The person defrauded cannot at the same time avoid the contract, and retain anything received by virtue of it of value either to himself or to the party who committed the fraud." Guckenheimer et al. v. Angevine, 81 N. Y. 394, 396.

The statu quo doctrine is thus based on the broad principles that one electing to rescind an existing contract cannot at the same time in effect take the opposite position of affirming the contract by retaining anything of value obtained through it, nor should he be allowed to profit in the same manner by the very fraud he charges against another. Whenever, therefore, the innocent party has obtained under the contract definite property which can be returned upon the rescission of the contract, the statu quo doctrine may be strictly and easily applied, but there are obviously many cases in which any such exact and literal return is impossible, and it thus becomes necessary to examine the limitations of the doctrine.

Although the rule states that the guilty party is to be restored to his original position, the reason for the rule as shown is not that any particular regard or consideration is due him, but simply that the attitude of the defrauded party upon bringing his action may conform to basic principles of pleading and equity, and not be open to criticism in these respects, as would be the case if he were allowed to retain property that came into his hands through the very fraudulent instrument that he would seek to avoid. But, if the attitude of the innocent party is not open to the objections mentioned, if he does not possess and so is not seeking to retain anything that would imply an affirmance of the contract or that would be inequitable for him to keep, the reason for the doctrine falls, and the doctrine itself becomes inapplicable. In such case the plaintiff's right of action is entirely unaffected by any consideration as to whether or not the defendant is or may be put in exact statu quo. If he is not or cannot be so placed, he has only himself to blame. An innocent party cannot be in any way prejudiced in his right of action by the fraudulent acts of the other party to the suit. The cases accordingly clearly recognize this important limitation to the statu quo doctrine. In Masson v. Bovet, supra, it is said:

"This [the necessity of restoration] is not exacted on account of any feeling of partiality or regard for the fraudulent party. The law cares very little what his loss may be, and exacts nothing for his sake."

This quotation is cited with approval in Hammond v. Pennock, supra; the opinion stating:

"If the wrongdoer has, by his own act, complicated the case, so that full restoration cannot be made, he has but himself to blame."

The case of Guckenheimer et al. v. Angevine, supra, also holds:

"The law cares very little what a fraudulent party's loss may be, and exacts nothing for his sake. Beardsley, J., Masson v. Bovet, 1 Denio, 74, 43 Am. Dec. 651. It certainly will not undertake to indemnify him for expenditures made in the prosecution of his fraudulent purpose."

It would accordingly seem to be inconclusive on this inquiry whether the insurance on plaintiff's life for any period actually cost the defendant anything or not.

There remains the principal, and in my view, the determining, question of this case, and that is whether the plaintiff by virtue of the in-

surance protection he has received under his policy now has or has had anything of value which he must return to the defendant. The difficulty that arises in determining this question results from the peculiar nature of the contract of insurance. In the case of most contracts, even those involving things that do not continue to exist and so cannot be returned, the subject-matter's cost to one party and value to the other are practically identical, and consequently, if the subject-matter cannot itself be restored by the injured party at the time he elects to rescind, he can easily return its exact value to him. This would evidently be the rule as regards things intended for consumption, as food and fuel, and also as regards such intangible things as leasehold privileges. In these instances, the value to the innocent party of the thing received would approximate its cost to the guilty party, and hence its value should equitably be returned or allowed for upon a rescission of the contract. But can it be said that the value to the insured or to his estate of life insurance protection for an elapsed period is fairly analogous, for instance, to a lessee's interest for a like period? In the latter case a person's present financial status may reasonably be said to be altered for the better as the result of his having previously enjoyed the benefits of occupation, even if he does not ever afterwards have in his possession, or stored away, the exact money equivalent of such occupation, inasmuch as otherwise he would presumably have expended money for a lease of other premises, even if he might not have paid out an amount exactly equal to the value of the premises he actually did occupy. But does the insured under a rescinded policy occupy any such position? Is his present financial condition at all improved over what it actually would now have been had he never had in the past any insurance protection at all? A man presumably requires a lease, if he actually does take a lease of property, in much the same way that he requires such necessaries as food and clothes. But can it be said that he requires insurance in any such sense, so that at any particular date he is measurably better off for having had insurance in the past?

An inquiry into the nature of the contract of insurance shows that it differs from ordinary contracts, in that, even if the insurer is at a definite expense for every outstanding policy, the insured does not receive in the protection given him any benefit at all comparable in definiteness and certainty to its cost to the insurer. The insured "must die to win," so what he really receives in return for his premiums or assessments is a chance that he or his beneficiary may obtain within a certain time a certain amount. An insurance policy is analogous to a lottery ticket. Both may be said to cost those who sell them approximately definite sums, but the buyer in each case obtains in return no such definite quid pro quo, but rather a chance which may or may not amount to anything. And, although this chance may be claimed to have an actual computable money value at a particular time, such value entirely lapses with the termination of the policy or the drawing of the lottery. Such peculiar temporary and time values as insurance policies or lottery tickets may be said to represent to purchasers of them seem to stand in a class by themselves and to be clearly differentiated from ordinary values such as are usually given and re-

ceived under contracts. Accordingly, if one has purchased such a time value, after the expiration of such time, it seems clear that he has never received any actual value, in the ordinary sense of the word, at all. He is really no better off than if he had never made such purchase, and consequently he has nothing whatever of real or actual value which he should return upon rescinding the contract under which it was obtained.

It will be noted from the above quoted statements of the statu quo doctrine that the language used clearly has reference to the time when the innocent party elects to rescind. He must restore what he "has by force of the contract under his own control." Accordingly it is not enough to claim that the innocent party has had in the past certain things or values. His obligation is to restore only that which he controls at the time of his election to rescind. As before shown, a reasonable working out of this rule would probably require in most instances a restoration of the money value of things consumed or intangible, and therefore impossible of actual restoration, inasmuch as the present financial status of the defrauded party might fairly be assumed to be affected thereby, but it is not apparent how the rule can be further extended so as to require a return of limited time values, estimated on a basis of costs to the guilty party, but which values are not in existence even in changed form or by representation at the time of the rescission of the contract, and which consequently affect in no way whatever the present status of the innocent party. Moreover, if defendant's position should be sustained the result would be that it would, in fact, profit by its own fraud. A mutual insurance association such as defendant does not assume to write insurance for profit, and if it may, upon being found guilty of fraud at the very beginning of its dealings with the insured, nevertheless retain upon the rescission of the policy the full mortuary cost and the usual loading by way of its own expenses, it in effect obtains from a defrauded party all that it assumes to charge any one, and so actually has by fraud increased its business and influence to the extent of one new member. If defendant's position be sound, a great temptation would undoubtedly exist for insurance companies to write insurance by fraudulent means, inasmuch as, if detected, they would still be allowed to retain all mortuary costs and loadings, and this, too, as proved by their own officers and records, and consequently most difficult for an outsider to dispute. See Strauss v. Life Association, 128 N. C. 465, 467, 468, 39 S. E. 55, 45 L. R. A. 605, 83 Am. St. Rep. 699.

If it be claimed that plaintiff's position herein in effect allows him to "make a speculation" out of defendant's fraud, as said by the Chief Justice in the Angers Case, cited infra, the answer would be that plaintiff is now seeking to recover back only what he has actually paid out, and that, while the policy was in force, he was paying for the protection he received the same as any other member. Furthermore, although the plaintiff has received a certain advantage in the past in the way of insurance protection which he would now be relieved of paying for inasmuch as the protection formerly received is of no real value whatever to him now, surely the defendant cannot reasonably complain, as what-

ever incidental advantage plaintiff may thus obtain over defendant is solely due to the latter's fraud. As between forcing an innocent party to make payment for questionable benefits received in the past when he now actually possesses nothing of value, directly or indirectly, under the fraudulent contract, his present status having been in no way bettered by anything actually received thereunder, and allowing him to retain whatever of past advantage he may have received solely as a result of the guilty party's fraud, the equities would seem to be clearly with the latter course. "The law cares very little what a fraudulent party's loss may be."

The conclusion so far reached seems also to be upheld by the weight of authority, although the cases are somewhat in conflict, and the precise point involved has seldom been passed upon. The plaintiff relies principally upon three English cases and defendant upon a Canadian decision. In Foster v. Mutual Reserve Fund Life Ass'n., 19 T. L. R. 342 (March, 1903), an action was brought against this same defendant for the rescission of a policy, on the ground of fraudulent misrepresentations as to the cost of carrying the policy, and to recover back the premiums paid, and it was held that he was so entitled. From the Court of Appeal the case was taken to the House of Lords (20 T. L. R. 715, July, 1904), where the judgment of the lower court was affirmed. It does not appear from these reports of the case that the question of offsetting against plaintiff's recovery the value of the insurance received was anywhere raised, although it will be noted that Nesbitt, J., who dissented in the Canadian case, cited infra, expressly says:

"I find in the record in the Foster Case in the House of Lords that the very point was made that there could not be a return of the premiums, because the plaintiff in that case had been kept insured and had in reality suffered no damage, but, notwithstanding such an argument, the House ordered a return of the premiums, with interest, and the same argument was addressed to the Court in the Cross Case, but without avail."

In Cross v. Mutual Reserve Life Ins. Co., 21 T. L. R. 15 (November, 1904), which was similar to the Foster Case, the trial justice directed judgment for the plaintiff, and apparently regarded the Foster Case as an authority against any allowance to defendant for insurance protection given. He is reported as saying:

"Mr. Terrill (for the defendant) had contended that, as there could be no restitutio in integrum, there was no right to rescind. If so, the decision of the House of Lords in Foster's Case was wrong."

The later case of Merino v. Mutual Reserve Life Insurance Co., 21 T. L. R. 167 (December, 1904), expressly follows the decisions in the last two cases; the argument as to the cost of insurance being rejected by the trial justice. It is recited in the case:

"It was suggested that this relief [an order for the payment of the premiums, with interest] ought only to be given upon terms. It was said that the defendants had been under the risk of the policy for a long period. But they had suffered no loss, and his lordship was not aware of any case in which damages or compensation had been given under such circumstances. The defendants had only themselves to thank for the position in which they were placed by the plaintiff."

The appeal in the Canadian case, referred to supra, and relied upon by defendant (Angers v. Mutual Reserve Fund Life Association, 35 Canada Sup. Ct. Rep. 330 [November, 1904]), was decided subsequently to the Foster Case, and was similar to it, except that here defendant proved the value of the insurance had to be equal to the premiums paid. The appeal from the judgment dismissing the complaint was dismissed, the court standing three to two; but, as the majority did not agree as to the grounds for dismissing the appeal, no costs were allowed. The Chief Justice, one of the majority, professes to base his opinion upon the civil law and authorities thereunder, and holds that no return of premiums can be allowed, inasmuch as the insured "got for his money all the value he had bargained for." He holds that there were fraudulent misrepresentations. Davies, J., of the majority, distinguishes this case from the Foster Case, on the ground that there was here no fraud, although he inclines to agree with the Chief Justice on the question of damages. Killam, J., of the majority, also finds that there was no fraud and thus distinguishes the Foster Case. Of the minority, Nesbitt, J., cited supra, writes a strong dissenting opinion, finding fraud and holding the Foster Case an express authority for the return of the premiums in full. "It may be said that this is hard measure, but there is high authority for saying 'the way of the transgressor is hard.'" Sedgewick, J., of the minority, concurs entirely with Nesbitt, J. It will thus be seen that two of the court regard the Foster Case as controlling here, and two more distinguish the case on the ground of no fraud; the Chief Justice being the only one to distinguish it on other grounds. Moreover, he was the only one of the majority who found fraud; the other two basing their opinions for dismissal upon the ground that there were no fraudulent misrepresentations. The remarks of the Chief Justice adverse to the plaintiff on the ground that he had got what he had bargained for must accordingly be deemed merely the expression of his own opinion, and not that of the court.

Further difficulties might be suggested to the application of the rule requiring the plaintiff to restore the value of his so-called protection prior to the time when his contract was rescinded. It is not clear, where the policy holder is to receive only so much upon his policy as is contributed by his associates upon an assessment, that the actual cost of the insurance to the company is any greater than his proportion of the running expenses of the company. Those expenses would seem to have been incurred in the consummation of the fraud, for which, under the cases cited, the defendant would not in any event be entitled to compensation. If the defendant could be held entitled to offset what could be called the value of the protection, such value is a most uncertain quantity. To what amount was he protected? Upon the policy of his friend Reilly, who became insured at the same time and afterwards died, his estate only recovered $6,000. When the fraud was discovered and the contract disowned, the plaintiff was 14 years older than when the contract was taken, and his insurance rate at his advanced age would be considerably greater. Moreover, his acceptability as a risk has possibly and presumably diminished within that period. In view of these considerations, it is not possible to say that the so-

called protection during the period of 14 years has not been an actual harm to plaintiff rather than a benefit. We are of opinion, therefore, that plaintiff is entitled upon rescission to recover the full amount of premiums paid, without deduction by reason of any so-called value received by him.

We are asked by the plaintiff to direct judgment in his favor, instead of granting a new trial. To this we think the plaintiff is entitled. The trial court has specifically found the amount of premiums paid to be $2,437.10, which, together with interest upon June 30, 1906, amounted to $3,530.34. Within the rule stated in Crowley v. State of New York, 112 App. Div. 872, 98 N. Y. Supp. 1094, we have the power to direct judgment in accordance with the actual findings of the trial court. Moreover, there can be no object in ordering a new trial. The amount of premiums paid is undisputed by the defendant, and, if we are right in our view that the plaintiff is entitled to a judgment for the full amount thereof without offset of any kind, the plaintiff is clearly entitled to the judgment which he asks. Judgment should be modified so as to allow the plaintiff the full amount of premiums paid, together with interest to date of the entry of the judgment here directed, together with costs in the trial court. Thus modified, the judgment is affirmed, with costs to the plaintiff in this court.

Judgment modified as per opinion, and, as modified, affirmed with costs to plaintiff. All concur, except CHESTER, J., who writes for affirmance and KELLOGG, J., who writes for reversal.

CHESTER, J. (dissenting). I see no difficulty in applying the doctrine of statu quo to this case, and I think equity requires that it should be applied. The plaintiff seeks the rescission of a policy of life insurance issued on his life by the defendant on the ground of false representations made by it to induce the plaintiff to enter into the contract, and to recover all the premiums paid by him upon the policy during the term of fourteen years, with interest thereon. The defendant is a domestic corporation, transacting the business of life insurance upon the co-operative or assessment plan.

I agree with the prevailing opinion that the finding of fraud by the trial court was based upon sufficient evidence, and that the case is a proper one' for the rescission of the policy. I cannot agree, however, that the plaintiff is entitled to the recovery of the premiums paid by him without any deductions therefrom for benefits enjoyed or for the expense to the defendant of carrying the insurance. The rule is well settled by numerous authorities that rescission can never be ordered on the ground of fraud or false representations without placing the defendant in statu quo. Gould v. Cayuga Co. National Bank, 86 N. Y. 75, 79; Vail v. Reynolds, 118 N. Y. 297, 23 N. E. 301; Lee v. V. Oil Co., 126 N. Y. 579, 27 S. E. 1018; Cox v. Stokes, 156 N. Y. 491, 51 N. E. 316. This rule requires the party seeking rescission to restore or offer to restore to the other party anything he has received under the contract. The argument of the prevailing opinion proceeds on the theory that the plaintiff has received nothing of value or substance under the contract that he can now return or restore, and therefore that the

doctrine does not apply. It is no more correct to say that a policy of life insurance is of no value to the insured because he did not die during the period covered by it than to assume that a fire insurance policy upon one's property has no value to the insured because the buildings did not burn while the policy was in force. In either case, the value follows from the protection enjoyed. The contract of life insurance is said in the prevailing opinion to be analogous to a lottery ticket, and that the insured must "die to win." It is altogether true that, under a policy payable upon the termination of the life of the person insured, he must "die to win," for that is the condition of the contract, but, where he dies, he does win for his family or those dependent upon him the amount payable under the terms of the contract, while a person who invests in a lottery ticket has only a remote chance of winning anything. Death is certain, and there is no chance about it. There is no fair analogy between the two cases. While the lottery ticket may or may not have value, depending upon the chance of its being one of a limited number in the drawing entitled to some prize, a policy of insurance has a well-defined and easily ascertained value, not only to the beneficiaries named therein, but to the insured as well. The latter in this case has enjoyed the benefits of the insurance for 14 years, and at any time during that period, if he had died, his beneficiaries would have been entitled to the moneys agreed to be paid to them under the policy. The carrying of this risk has been a large, but easily ascertained, expense to the defendant, and it is the duty of the plaintiff under the law, as I understand it, to restore or refund this to the defendant if he is to have the rescission he seeks. It is within the power of the court to compel such refunding as a condition of granting the relief.

By wholly undisputed testimony the defendant proved, and the court found, that the mortuary cost of the plaintiff's policy during the period in question was $1,526.72, and the total actual expenses therein to the defendant was $728.42, and the interest on said sums $983.15, making a total of $3,238.29. This mortuary cost and these expenses were incurred by the defendant wholly for the benefit of the plaintiff in carrying this insurance upon his life during the 14 years in question. The amount of such cost and expenses was deducted by the trial court from the aggregate amount of the premiums paid by him during that time, and judgment was awarded to him for the balance.

This, under the proofs and the findings, was, in my opinion, a correct application of the rules of equity governing the case, and therefore I think the judgment was right, and should be affirmed.

JOHN M. KELLOGG, J. (dissenting). The plaintiff brings the defendant into a court of equity, contending that he is entitled to have his policy of insurance rescinded on account of the defendant's fraud, and the rights of the parties adjusted upon equitable principles. There are two reasons why he is not entitled to recover in this action:

First. No fraudulent representations are shown which have been in any manner injurious to or affect the value of his policy. He contends that in the report made to the insurance department in 1891, which was communicated to him by an officer of the association before filing,

the contingent liabilities of the association was misstated by the omission of $523,000 on account of deaths which had been reported, but as to which no proofs of loss had been received. The report was made upon blanks furnished by the insurance department, and the evidence shows that it was the practice of all such co-operative companies, approved by the insurance department, to treat losses which had been reported but as to which no proofs had been received, as not forming a liability against the association. In stating the contingent mortuary liabilities, the report states the amount of losses approved, the losses reported and in process of adjustment, the losses resisted, and then, as another item:

"All other contingent liabilities, viz., net present value of all policies in force December 31, 1891, computed as renewable term insurance for 60 days, Actuaries' Table of Mortality, interest 4 per cent. All policies terminate by limit of time each 60 days. Subsequent payments maturing each 60 days equal liability for future death claims, based on combined Experience Table of Mortality......$570,072.00."

It is true that no such liability as that mentioned after the "viz." in the paragraph above quoted existed. We therefore may disregard that part of the paragraph, and treat the report as stating "all other contingent liabilities against the association as $570,072,00." The report therefore, as an entirety, is an overstatement, instead of an understatement, of the contingent liabilities.

But, if we assume that this contingent mortuary liability is not mentioned in the report at all, and should have been stated, the plaintiff has suffered no harm, for the reason that this contingent liability would be balanced in the report by the statement of an equal amount as contingent assets, for the association had the right to issue an assessment against its policy holders for all losses, so that, if this item had been put under the liabilities, the assessments to be levied to meet it should have been put in as contingent mortuary assets. It is error to say that the contingent mortuary assets contain an item to balance this $570,-072.00, because the statement shows that the contingent mortuary liabilities exceed by over $100,000 the contingent mortuary assets, and all the contingent mortuary assets are stated to be mortuary assessments called, and not yet due. It is evident that no assessment could be called for deaths which had not been approved or audited. In any event, therefore, the report which was communicated to the plaintiff overstated the contingent mortuary liabilities of the defendant, and the claim that it understood them is purely technical and without merit. The Appleton report to the insurance department, in evidence, shows clearly that, if these claims are reported as a contingent mortuary liability, the assessment which the policy holders must pay to meet the claims must be stated as an asset, so that it is immaterial for the practical purposes of this case whether an omission was made of this contingent mortuary liability, so long as there was an omission of the contingent mortuary assets which would meet the liability. It is not claimed that the losses during the 60 days which were omitted from the report were extraordinary, or of such an amount that the occurrence of the number of deaths within the time stated would have been a circumstance detrimental to the standing of the association, or that said losses in any way

impaired or lessened the assets or the financial standing of the association. The plaintiff is wrong in assuming that after he became a member he was assessed for the payment of these prior unreported deaths. Under the law and the rules of the association, he could only be assessed for deaths occurring while he was a member of the association, and no assets of the association in which the plaintiff had or could have had any interest could be used to pay any such death claims.

Second. The policy of insurance provides that the contract is a bimonthly term insurance, renewable at the option of the member, and that no personal liability is incurred by becoming a member·of the association. This policy differs in many respects from ordinary life insurance policies, and may properly be considered as temporary insurance, whereby the insured gets the protection for the two months in which the policy is in force, and for the following like periods for which it is renewed, and gets no other benefit from the policy. It is not a policy where accumulations are made to it. At the end of each two months the association has earned all the money the member has paid, and the member has received all the benefits which the policy contemplates that he may have in any event. The plaintiff, therefore, has received every benefit which he expected when he took out his insurance. I think it is too narrow a view to consider an insurance policy like a lottery ticket. It is a definite contract, having a market value, and costs the company issuing it certain sums, and is worth to the member just such a sum as like insurance would cost him elsewhere. We may therefore in this case treat it in the same way that we would a barrel of flour, a commodity bought in the market and which when consumed is of no further value to the purchaser, but which was of passing value to him for the purpose for which he purchased it. It seems to be conceded that if a sale of flour is induced by fraud, and the flour has been used up by the purchaser, that he cannot recover the entire purchase price, but must allow what the flour was actually worth. The cost of this policy of insurance to the association, and its value to the insured, can be ascertained by those familiar with insurance nearly as definitely as the value of a barrel of flour. The plaintiff has received all that the contract contemplated he should receive. If he had died during any of the years, we must assume that his estate would have been paid according to the tenor of the policy. He therefore had the full benefit of it, and it would be inequitable and unjust to the other policy holders in this mutual association to require assets belonging to them to be paid over to the plaintiff upon a technicality, when during all the years he has received the full benefit which the association agreed to give him or which he intended to receive. There is no evidence in the case tending to show how this policy would have been any more valuable to the plaintiff if this contingent mortuary liability referred to had not existed, or how the statement of such a liability in the report, if balanced by a corresponding asset which the defendant was entitled to, could prejudice the plaintiff.

It is suggested that the plaintiff is now older and the cost of insurance is greater if he is required to take a new policy in another company, and that, therefore, he is wronged. No actual wrongdoing has been

shown against the defendant with reference to the plaintiff. The fact that he allowed his policy to lapse and must now go uninsured or obtain insurance at a higher price can be no advantage to him here. As stated before, for all that appears in this case, the omission to report these deaths as a contingent mortuary liability and to balance it upon the other side by a statement of the assessments to be levied as a contingent mortuary asset does not affect the standing of the association or the value of his policy. It would be inequitable, after the plaintiff has received just what he bought, now to allow him to recover the purchase price and interest upon it. upon a strained construction of a report which was made to correspond with the general practice of such association and the ruling of the insurance department.

Therefore, for the reason that no material misrepresentation has been shown, and also that the plaintiff has suffered no loss, I favor a reversal of the judgment.