No. 46,976

Bernard R. Dreiling, *Appellee,* v. Home State Life Insurance Company, *Appellant.*

(515 P. 2d 757)

138

*James W. Sargent,* of Regan, Sargent, Klenda, McGannon & Paup, of Wichita, argued the cause, and *Collins & Collins,* of Wichita, were with him on the brief for the appellant.

*H. R. Kuhn,* of Arn, Mullins, Unruh & Kuhn, of Wichita, argued the cause, and was on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is an action for the rescission of two insurance contracts almost two years after their issuance for fraudulent misrepresentations made by the insurance company's salesman and its agency director.

There being no basic dispute in the facts, the points asserted on appeal call for a review of the law applied by the trial court in determining the controversy.

Bernard Dreiling (plaintiff-appellee and cross-appellant) worked as a barber in Wichita, Kansas, at all times relevant to this case. The Home State Life Insurance Company (defendant-appellant) was a newly organized life insurance company and instituted a vigorous campaign of selling life insurance in the Wichita area in the years 1968 and 1969.

Early in 1967 Dreiling purchased 3500 shares of stock at $2.50 per share from First National Investors Corporation (FNIC), which is the parent company of Home State Life Insurance Company, the appellant herein. This purchase was made before the Home State Life Insurance Company was formed. Dreiling later learned about its formation through a friend.

In order to accomplish its "fast selling" program to get "quick money", the Home State Life Insurance Company brought into Kansas what is known in the trade as "blue suede shoe" type of salesmen who were otherwise characterized as "hot shots, contact men and storm troopers". The scheme of operation of the appellant involved seeking out persons who appeared to have a broad "sphere of influence" in the community. Mr. Dreiling has over six hundred customers passing through his barber shop per week. Such individuals were solicited by the company and appointed

"county directors." Their only function in the company's scheme of operations was to act as a "bird dog" for the company and refer names of prospective customers to agents of the company. The list of "county directors" was then used by the soliciting agent as an entree in making his pitch to the customer. In order to permit the payment by the company of a "referral fee," it was necessary for the company to assist the "bird dog" and "county director" in procuring an insurance license from the insurance commissioner's office. The "bird dog" or "county director" was specifically prohibited from selling the company's insurance program; he did not have to be knowledgeable in the insurance field and was appointed as a "county director" for the company only because of his contact or influential position with potential customers.

Dreiling first had contact with the Home State Life Insurance Company in March of 1969. At that time an agent of the Home State Life Insurance Company named Kelly Pete contacted and arranged to meet with the Dreilings. In the meeting Pete discussed a policy referred to as the AC5 contract.

The record discloses the AC5 insurance contract in question is, in reality, a combination of eight policy forms put together. Some of its features are:

(a) $10,000 of ordinary life insurance with premiums payable over a twenty-year period;

(b) $36,000 of decreasing term insurance, decreasing at the rate of $900 per year;

(c) a provision for the return of all premiums in the event of death of the insured;

(d) increasing death benefits in the form of a rider;

(e) a change option so the owner could do away with all riders and make a normal 20-pay life policy out of it; lowering the premium to a little less than half; and

(f) a 10-year paid-up option provision.

Mr. Dreiling testified the first thing Kelly Pete did was to show him and his wife a big book with all of the names of the county directors of the Home State Life Insurance Company. He then proceeded to tell them about the AC5 contract, which Mr. Dreiling described as sounding "fantastic, as far as life insurance coverage and the investment benefits." Regarding the policy taken on the life of his daughter, Mr. Dreiling testified:

". . . He said that Mary, who is age four, would have life insurance policy of $10,000 with annual premium payments of $415 and some odd cents plus a 10% dividend paid annually on this $415, which I could either take out

or leave in and I would draw another 10% upon what I left in. I had to make two payments of $415 per year. I told him I could do it this year and next year maybe not and he said that the great thing about the AC5 is the fact that you are only required to make two payments. You can make more payments and get 10% dividends on whatever you put in. I asked how a company could do this and make money. He said that we are a new insurance company and it brings in quick money and we are not going to do this for too long a period of time and then they will start selling straight life insurance. My wife and I asked him several times to make clear that no more than two payments were required. He agreed that this was the case each time. He told us that we would receive 10% of the 800 plus dollars, that Mary would be insured for $10,000, after five years I could get my initial investment back and still have the insurance paid up, and if I left my dividends in I was to get 10% on it.

"He further told us that after making two annual payments, insurance would remain in full force and effect and everything stays intact. At this time I signed an application for the AC5 policy with Mr. Pete. I gave him a check for the first payment in the amount of $415 and some odd cents. I made a subsequent payment the following year.

"Kelly Pete and Mr. [George] Hamic, who was the agency director for Home State Life delivered the contract to me. After reading the contract, I saw there was nothing in it about the investment portion, the 10% return, and the two annual payments. When I brought this up to Mr. Hamic, he said this portion of the contract hadn't been approved by the State Insurance Commissioner and that when it was it would be delivered to me. When I asked how I would know this would come about, he said that there were responsible men on the Board of Directors and that if the company reneged on their promises, the businesses of the Directors would suffer. I then signed the receipt for the policy. They told me that after the changes were approved by the Insurance Department, that they would be delivered to me in a separate contract."

## On cross-examination Mr. Dreiling testified:

"Mr. Kelly Pete and Mr. Hamic said that these representations were not contained in the policy because such provisions had not yet been approved by the Insurance Commissioner. They said that this had to be done in the future, and the Agency Director said that even [if] it were not passed by the Insurance Commissioner, the Board of Directors would not renege on the contract as alleged, with the investment portion of it."

## Mrs. Dreiling, the wife of Bernard Dreiling testified:

"Kelly Pete told my husband and I that we are simply purchasing another part of the company, a life insurance policy with an investment feature, which was very desirable to us. I say 'another part of the company' because of the stock interest my husband already had in FNIC. We would buy the policy and also have the investment feature because these were special contracts put out for this three, five year period—I am not sure what he said.

"He said that we could pay the premiums and be assured of 10% annual interest and we would have the life insurance, and I believe that at the end of five years, as I remember, if you have not taken anything out you are even

money and you have had the life insurance policy all these years. Once you have made two payments you can discontinue making them.

"The policy would become so-called 'self sustaining' after two annual premiums. . . ."

The receipt signed by the Dreilings on Mary's policy reads in part:

"The agent delivering this contract has gone over it with me and I understand its provisions. I agree that the contract as issued contains all representations, warranties and covenants and further acknowledge that no verbal commitments have been made or will be recognized by the Company."

Approximately two months after the purchase of the policy on their daughter Mary, Mr. Hamic approached Mr. Dreiling about becoming a county director for the company. As a stockholder of FNIC Dreiling was eligible. Hamic told Dreiling he did not need an insurance license to become a director, as such, but he did need one to receive the referral fee of $24.00 on each $10,000 policy sold as a result of his referral of a customer to the company. Dreiling had no home training course with the Home State Life Insurance Company, but he was given a manual and he was told what sections to study. On the first exam he passed only one of the three sections. He studied hard on the other two sections and passed them on the next examination, whereupon he was given a license by the Kansas Insurance Commissioner.

There was nothing in the insurance manual given Dreiling relating to "paid-up" insurance or the AC5 policy.

In September of 1969 the Dreilings purchased a second policy from appellant, this time to cover their son, Gerald. The agent involved on this occasion was Mr. Harold Solomon. The conversation regarding the purchase of the second policy led Mr. Dreiling to believe the investment features of the policy were consistent with the representations made regarding the initial sale. Mr. Solomon told him the investment features had not yet been approved by the insurance commissioner. The Dreilings receipted for the policy on a form using the same language as quoted above. The second policy issued did not set forth the investment features.

For the next year and one-half the Dreilings continued to pay the annual premiums on both policies, and Mr. Dreiling served as a county director. The effective date of the policy on Mary Dreiling was April 7, 1969, and on Gerald Dreiling was August 28, 1969. In April of 1971 the Dreilings received notice to pay a third annual premium on the policy purchased for their daughter. Immediately,

they attempted to ascertain why a third premium notice was sent, because they had been told only two annual premiums were necessary. By this time there had been a complete turnover in the agents employed by the Home State Life Insurance Company. Mr. Dreiling talked with Mr. Whitworth, the present agency director, and demanded a return of all his money, or a policy containing the provisions represented to him by Pete, Hamic and Solomon. Home State was willing to rewrite Dreiling's policies into straight life policies with a reduced premium, but refused to honor the policies as represented by its agents, who were no longer connected with the company, or to refund all money paid by the Dreilings. It was at this time the Dreilings sought legal advice and this action for rescission was instituted.

The petition alleged three fraudulent misrepresentations: (1) That the insurance company would pay Dreiling a sum of money equal to 10% per annum on all funds deposited with the Home State Life Insurance Company as premium payments; (2) that after two annual premiums the life insurance would be deemed fully paid; and (3) that the two annual premium payments, if left on deposit three more years, would authorize him to withdraw the two annual premium payments and still have $10,000 paid-up life insurance.

The petition was stated in three causes of action. In his first and second causes of action Dreiling asked for rescission of both insurance contracts and prayed for a return of the premiums paid to the Home State Life Insurance Company in the amount of $1,663.65, said sum representing the total of the two annual premium payments on both insurance programs purchased by Dreiling and sold by agents of the Home State Life Insurance Company. In a third cause of action Dreiling sought punitive damages in the amount of $50,000.

The trial court after hearing the matter made findings and entered an equitable judgment. The journal entry of judgment recites:

"1. That the present management of Home State Life Insurance Company had nothing to do with the false representations made to the Plaintiff; that the claim of the Plaintiff for punitive damages against the Defendant should be denied.

"2. That because of the false representations made by agents of the Defendant in its employ at the time that the contracts of insurance went into effect, the Plaintiff is entitled to a judgment rescinding both contracts. That in order to do equity between the parties, the Court finds that the sum of Six

Hundred Seventy Dollars ($670.00) should be deducted from the total amount of the deposits made by the Plaintiff, which deposits were in the sum of One Thousand Six Hundred Sixty-three & 65/100 Dollars ($1,663.65). That said sum of $670.00 represents the actual cost of the ordinary life insurance coverage which was afforded to the Plaintiff under the contracts of insurance during the two (2) year period of time that said policies were in force.

"3. The Court further finds that because the Plaintiff had received from the Defendant the approximate sum of Five Hundred Dollars ($500.00) as referral fees, Plaintiff's claim for interest should be disallowed to this date. That the Plaintiff should have a money judgment against the Defendant in the net amount of Nine Hundred Ninety-three & 65/100 Dollars ($993.65), with interest from this date, and his costs.

"IT IS THEREFORE, BY THE COURT CONSIDERED, ORDERED, ADJUDGED AND DECREED that the foregoing findings be and they are hereby declared to be the judgment and decree of this Court.

"IT IS FURTHER BY THE COURT ORDERED, ADJUDGED AND DECREED that the Plaintiff have judgment against the Defendant in the sum of Nine Hundred Ninety-three & 65/100 Dollars ($993.65), with interest from this date, and his costs."

Appeal has been perfected to this court by the Home State Life Insurance Company from the court's judgment rescinding the transactions, and a cross-appeal has been perfected by Dreiling from the court's judgment for failure to order full restoration of premiums paid in the total sum of $1,663.65, and in denying punitive damages. In his brief Dreiling abandons his claim for punitive damages.

The appellant first contends the trial court erred in ordering rescission of the two contracts where the appellee's evidence shows only that the representations by the appellant dealt with actions which, in the future, might or might not occur.

The law is clear that in order to constitute actionable fraud representations must relate to some material past or present fact. (*Stegman v. Professional & Business Men's Life Ins. Co.*, 173 Kan. 744, 750, 252 P. 2d 1074; *Pioneer Nat'l Life Ins. Co. v. Hall*, 145 Kan. 785, 788, 67 P. 2d 518.) The appellant argues since plaintiff realized the provisions regarding investment features and paid-up insurance after two annual premiums were not included in the written insurance contracts, the representations did not deal with present or past facts, but with something which might occur in the future.

In his argument the appellant overlooks the explanation given by the agent to Dreiling concerning the contracts' silence on the above mentioned provisions. The agent stated the provisions had not yet been approved by the insurance commissioner, but upon approval they would be delivered to Dreiling in a separate contract. In any

event, the agent further explained, the company's board of directors were responsible men and would not allow the company to renege on any of its promises. The representations were not that the provisions would become operative in the future, when and if approved by the commissioner, but that they existed at the time represented, and were a part of the policy sold. The Dreilings were induced to purchase policies containing the investment features and paid-up insurance provisions at the time of issuance, not policies which were to have those features added in the future, if approved. (See, *Stegman v. Professional & Business Men's Life Ins. Co.*, supra, and *Pioneer Nat'l Life Ins. Co. v. Hall*, supra.) The misrepresentations, as found by the trial court, pertain to existing terms of the policies, as opposed to promised provisions, if and when approved by the insurance commissioner in the future.

Appellant next contends the appellee is estopped to petition for rescission, having retained the policies with knowledge of omissions for over two years regarding the first policy and twenty-two months on the second policy. The appellant relies on two decisions, *Federal Agency Investment Co. v. Holm*, 123 Kan. 82, 254 Pac. 391 and *Pioneer Nat'l Life Ins. Co. v. Hall*, supra.

In *Holm* the defendant purchased insurance and stock in the company upon false representations that policy dividends would pay for the note he signed. Other misrepresentations were also made, all of which were discovered not to be true by January of 1924. The note was executed in December of 1923. Suit was not brought on the note until May, 1926. During all this time *Holm* kept the policies. The court found the defendant was precluded from raising fraud as a defense to the note because he had signed policy receipts stating he had examined the policies and found them to be as represented, and had retained the policies for two years after discovering the misrepresentations without complaining.

The point distinguishing *Holm* from the case at bar is that Dreiling did not retain the policies two years after learning of the misrepresentations. Even though Dreiling realized the investment provisions were not contained expressly in the insurance contracts, the explanation given by the agent convinced him the provisions were nonetheless part of the policies, and it was not until he received the third annual premium notice in April of 1971 that he became aware the representations were false. After realizing misrepresentations had been made, Dreiling immediately demanded that the appellant

correct his policies or return his premiums. This lawsuit was filed on June 3, 1971. On these facts Dreiling is not estopped from asserting fraud in a lawsuit to rescind the contracts.

The fact that Dreiling signed a receipt for the policies stating he had examined them and found them to be as represented does not preclude him from rescinding the contracts. Here Dreiling challenged the omissions in the policies and accepted and signed the receipts for them only after extracting the express promise from agents of the appellant that the omitted features of the bargain constituting part of the consideration would be delivered to him later by separate instrument. As in *Stegman* the appellee here was effectively lulled to sleep, and it was not until April, 1971, that the appellee discovered and learned that the omitted portion of the "program" which he purchased was never intended by the appellant to be forthcoming. In *Pioneer* it was not even claimed the receipt was procured through fraud.

In *Stegman v. Professional & Business Men's Life Ins. Co.,* supra, the court said:

". . . But even where a receipt contains contractual features it may be explained where execution thereof is induced by fraud. (32 C. J. S., Evidence, § 926a.) If the rule were otherwise it would preclude the setting aside of contracts induced by fraud which, of course, has never been true.

"Here the entire transaction was permeated with fraud from its inception. An invariable qualification of the rule which makes parol evidence inadmissible to vary the term of a written instrument is the one which permits such testimony where a contract is induced or procured by fraud. . . .

. . . . . . . . . . . . . . .

"Here the application and receipt were both obtained by fraud. Fraud vitiates whatever it touches including final judgments and final orders as well as contracts. . . ." (pp. 750, 751.)

Most of the assertions made by the appellant in its statement of points for reversal pertain to the appellee's retention of the policies for a long period of time prior to any attempted rescission. The legal theories argued by the appellant on this premise are estoppel, the statute of limitations and laches. Throughout it is the appellant's position the appellee knew when the policies were delivered that the "investment features" had not been included in the contracts. The appellee called this to the attention of the agents, Pete and Hamic, on the daughter's policy and noticed it when the son's policy was delivered. This the appellant contends charged the appellee with knowledge of the fraud. But the trial court found

against the appellant on this point and the evidence supports the finding.

Other evidence heard by the trial court included an admission made by the appellant's agency manager, Mr. Whitworth, that other purchasers of the AC5 policy complained and partial refunds had been made; the reference of Harold Solomon, an ex-agent of the appellant, to the "blue suede shoe type" agent of the appellant; Harold Solomon's further statements that he left the company because of this type of salesman; and testimony of Mr. and Mrs. Dreiling relating to Mr. Solomon's conversation with them in the courthouse during the trial as to the company's prior agency director.

The trial court found under all the circumstances that the appellee acted with reasonable diligence in the matter. On the record here presented the plan or scheme of using the time element to the benefit of the appellant was devised solely by the appellant's "blue suede shoe boys" and was undoubtedly calculated to lull the appellee and other purchasers to sleep.

The appellant claims prejudice resulted to the company in this instance. The appellant in its brief says:

". . . Consider the following:

"All of the principal participants who had dealt with the plaintiff on behalf of the Company had departed by at least October of 1970. Plaintiff, from the time of the purchase of the first policy, was closely associated with Home State as the county director and, clearly, must have known this. *Likewise, plaintiff received substantial insurance coverage during the two year period which in no way can be made the subject of a rescission some two years hence.*

"The ownership, control and management of Home State changed hands after the policy transactions by the plaintiff with the Company. Notwithstanding, and all the while, plaintiff stood by knowingly and silently as witnesses disappeared and Home State changed hands. Clearly, the management and new owners are innocent.

"Just as clearly, this is a material change of circumstances which would allow laches and estoppel to be successfully asserted."

The prejudice which the appellant is trying to assert is totally non-existent. Except for having gotten rid of the "blue suede shoe type" of salesmen and agents, the appellant is in no worse position than it was at the time of the contracts.

It is indeed novel to assert that the principal participants of the appellant who dealt with the appellee had departed thereby causing prejudice to the company. Can a company avoid the legal consequences of fraud and deceit merely by discharging or otherwise

getting rid of the spokesman or agent who dealt on behalf of the company? Obviously it cannot.

A corollary to the concept of continuity of corporate existence is the continuing responsibility of the corporate entity for contractual obligations. Notwithstanding any change in management or ownership, the appellant now is just as responsible and liable as it was when its agents were contracting with the appellee.

A two year statute of limitations under K. S. A. 1972 Supp. 60-513 (3) is prescribed for "An action for relief on the ground of fraud, but the cause of action shall not be deemed to have accrued until the fraud is discovered." The fraud was first discovered on the record here presented in April, 1971 when the third premium notice was received. The action was filed approximately two months after discovery of the fraud.

On his cross appeal the appellee takes the position the transactions complained of were permeated with fraud and a judgment should have been entered in his favor in an amount equal to the net amount paid on both insurance contracts. This raises the question whether the trial court erred in deducting $670.00 as the reasonable cost of two annual insurance premiums for the children's policies from the total sum of $1,663.65 paid.

As heretofore noted this is an action for the rescission of two life insurance contracts almost two years after their issuance.

Rescission of a contract is the annulling or abrogation or unmaking of the contract and the placing of the parties to it in status quo. It necessarily involves a repudiation of the contract and a refusal of the moving party to be further bound by it. (Black's Law Dictionary 4th Ed. p. 1472.) It is said to be the unmaking or an undoing of the contract from the beginning, and not merely a termination. (17A C. J. S., Contracts, § 385 [2].) Rescission is described in *Cleaves v. Thompson,* 122 Kan. 43, 46, 251 Pac. 428, as follows:

"Rescission is an equitable remedy designed to afford relief from contracts entered into through mistake, fraud, or duress. Ordinarily, the nature of relief asked in such cases must be such as to place the parties in their original situation. . . ."

The general rule is that one who seeks to rescind a contract, or to have equity rescind it, must place the other party in substantially the same condition he was in when the contract was executed but there are a number of exceptions to the rule. This is peculiarly so in equity where the two fundamental reasons for the rule are that

he who seeks equity must do equity, and he must restore or offer to restore to the other party the benefits received by him under the contract, to be entitled to relief. (*Bell v. Keepers,* 39 Kan. 105, 17 Pac. 785; *Beneke v. Bankers Mortgage Co.,* 119 Kan. 105, 237 Pac. 932; and *Baron v. Lyman,* 136 Kan. 842, 18 P. 2d 137.)

In 12 Williston on Contracts, § 1530 (3rd Ed.—Jaeger 1970) the learned authority says that where on the particular facts it seems equitable to allow rescission without complete or perfect restoration of the consideration, the going tendency favors the relief, and courts of law adopting the more liberal rule in equity no longer adhere to the strict construction generally upheld in the earlier decisions.

Kansas decisions have recognized the qualified application of the status quo rule. In *Fairbanks v. Walker,* 76 Kan. 903, 92 Pac. 1129, the court said:

"The rule that upon the recission of a contract for the purchase of a chattel the parties must be placed *in statu quo* does not require, in all cases, that an absolute and literal restoration of the parties to their former condition shall be had, but it will be sufficient if such restoration be made as is reasonably possible, and such as the merits of the case demand." (Syl. 3.)

Another case in accord with the qualified application of the status quo rule is *Shields v. Meyer,* 183 Kan. 111, 325 P. 2d 29. In *The State, ex rel., v. Cross,* 38 Kan. 696, 17 Pac. 190, a situation was presented where the court found the status quo rule inapplicable for public policy reasons.

The Court of Appeals of Maryland in *Funger v. Mayor of Somerset,* 244 Md. 141, 223 A. 2d 168 (1966) enumerated the exception to the status quo doctrine in the following language:

". . . Equity will in an appropriate case order rescission without restoration if: (1) the performance by the one against whom rescission is sought has become worthless, or (2) the respondent has prevented its return, or (3) the performance conferred only an intangible benefit upon the complainant, or (4) only a promise was given, or (5) the complainant can properly retain it irrespective of the voidable transaction, or (6) it is in possession of or is subject to the order of a person having a right superior to the complainant, or (7) restoration is impossible for some reason not hereinbefore mentioned and the clearest and strongest equity demands that rescission be granted (sometimes with a monetary substitute for restoration). *Restatement, Restitution* §§ 65 and 66; *Restatement, Contracts* §§ 480 and 481; 3 Black, *Rescission and Cancellation,* §§ 616-27; 17A C. J. S. *Contracts* § 438; 12 C. J. S. *Cancellation of Instruments* § 44 (b); 17 Am. Jur. 2d *Contracts* §§ 513 and 514; 13 Am. Jur. 2d *Cancellation of Instruments* § 38." (pp. 151, 152.)

In the case at bar the trial court felt the appellant had been

benefited by the two years insurance coverage on each policy, and it therefore ordered the appellant to return the value of that coverage to the insurer, under the status quo doctrine. We have been cited to no Kansas cases controlling the point. The question posed is whether the appellee by virtue of the insurance protection he has received under his two policies now has or has had anything of value which he must return to the appellant. The difficulty that arises in determining this question results from the peculiar nature of the contract of insurance.

The appellate division of the Supreme Court of New York in *Moore v. Mutual Reserve Fund Life Association,* (1907), 121 App. Div. 335, 106 N. Y. S. 255, examined the limitations of the status quo doctrine on the point in question, where a policy holder sought to rescind the policy of life insurance on the ground of fraud. There the court said:

"An inquiry into the nature of the contract of insurance shows that it differs from ordinary contracts in that, even if the insurer is at a definite expense for every outstanding policy, the insured does not receive in the protection given him any benefit at all comparable in definiteness and certainty to its cost to the insurer. The insured 'must die to win,' so what he really receives in return for his premiums or assessments is a chance that he or his beneficiary may obtain within a certain time a certain amount. An insurance policy is analogous to a lottery ticket; both may be said to cost those who sell them approximately definite sums, but the buyer in each case obtains in return no such definite *quid pro quo,* but rather a chance which may or may not amount to anything. And although this chance may be claimed to have an actual computable money value at a particular time, such value entirely lapses with the termination of the policy or the drawing of the lottery. Such peculiar temporary and time values as insurance policies or lottery tickets may be said to represent to purchasers of them seem to stand in a class by themselves and to be clearly differentiated from ordinary values such as are usually given and received under contracts. *Accordingly, if one has purchased such a time value, after the expiration of such time it seems clear that he has never received any actual value, in the ordinary sense of the word, at all. He is really no better off than if he had never made such purchase, and consequently he has nothing whatever of real or actual value which he should return upon rescinding the contract under which it was obtained.*" (p. 341.)   (Emphasis added.)

In answering the defendant's contention that the insured received something of value for the protection afforded him the value of which must be returned, the court said:

". . . Moreover, if defendant's position should be sustained the result would be that it would in fact profit by its own fraud. A mutual insurance association such as defendant does not assume to write insurance for profit, and if it may, upon being found guilty of fraud at the very beginning of its dealings

with the insured, nevertheless retain upon the rescission of the policy the full mortuary cost and the usual loading by way of its own expenses, it in effect obtains from a defrauded party all that it assumes to charge any one, and so actually has by fraud increased its business and influence to the extent of one new member. If defendant's position be sound, a great temptation would undoubtedly exist for insurance companies to write insurance by fraudulent means, inasmuch as, if detected, they would still be allowed to retain all mortuary costs and loadings, and this too as proved by their own officers and records, and consequently most difficult for an outsider to dispute. (See *Strauss v. Life Association*, 128 N. C. 465, 467, 468.)

"If it be claimed that plaintiff's position herein in effect allows him to 'make a speculation' out of defendant's fraud, as said by the chief justice in the *Angers* case cited *infra*, the answer would be that plaintiff is now seeking to recover back only what he has actually paid out and that while the policy was in force, he was paying for the protection he received the same as any other member. Furthermore, although the plaintiff has received a certain advantage in the past in the way of insurance protection which he would now be relieved of paying for inasmuch as the protection formerly received is of no real value whatever to him now, surely the defendant cannot reasonably complain, as whatever incidental advantage plaintiff may thus obtain over defendant is solely due to the latter's fraud. As between forcing an innocent party to make payment for questionable benefits received in the past when he now actually possesses nothing of value, directly or indirectly, under the fraudulent contract, his present status having been in no way bettered by anything actually received thereunder, and allowing him to retain whatever of past advantage he may have received solely as a result of the guilty party's fraud, the equities would seem to be clearly with the latter course. 'The law cares very little what a fraudulent party's loss may be.'

"The conclusion so far reached seems also to be upheld by the weight of authority, although the cases are somewhat in conflict and the precise point involved has seldom been passed upon. . . ." (pp. 342, 343.)

In a similar case the Supreme Judicial Court of Massachusetts in *Harwood v. Security Mutual Life Ins. Co.*, (1928), 263 Mass. 341, 161 N. E. 589, held: for an insured to rescind a life insurance policy and recover the premiums paid for the misrepresentation by the insurer as to the nature and character of the policy on which he was induced to accept it, it is not necessary that he restore the value to him or the cost to the company of the insurance. (See also *Myler v. Fidelity Mut. Life Ins. Co.*, (1917), 64 Okla. 293, 167 Pac. 601.) A decision to the contrary by the Supreme Court of Oregon in *Albertus v. ICOA Life Ins.*, (1967), 247 Or. 618, 431 P. 2d 264, held that an insured who secured rescission of six insurance policies on the ground of fraud in the inception of the policies was entitled to the return of the full amount of the premiums paid, less actual cost to the insurer of carrying the risk while the policies were in force

and until the date of the insured's demand for return of the premiums.

We are persuaded by the reasoning in the *Moore* and *Harwood* decisions and therefore adopt the rule for which they stand in determining the point presently before us. Accordingly, the trial court, after rescinding the insurance contracts on the ground of fraud, erred in deducting the cost of two annual insurance premiums for the two policies in question from the total sum paid by the appellee for the contracts.

The referral fees received by the appellee from the appellant in the approximate sum of $500.00 are not related to the insurance policies upon which this action for rescission was instituted and need not be tendered or restored in any event, except the referral fees of $24.00 paid to the appellee on each of the two policies purchased by the appellee. For this payment the appellant is entitled to a credit of $48.00 on the money judgment.

The judgment of the trial court is affirmed as to the appeal and reversed as to the cross appeal, with directions to enter judgment for Bernard Dreiling in the sum of $1,615.65 plus interest from February 16, 1972.