## MYLER et al. v. FIDELITY MUT. LIFE INS. CO. OF PHILADELPHIA.

No. 8217—Opinion Filed July 24, 1917.

Rehearing Denied Sept. 25, 1917.

(167 Pac. 601.)

(Syllabus by the Court.)

1. **Insurance — Substitution of Policies — Fraud — Rescission—Laches—Sufficiency of Petition.**

A contract between an insurer and an insured involving a substitution of one for another policy of life insurance is intrinsically fiduciary, and necessarily calls for perfect good faith and full disclosure on the part of the insurer.

(a) Where, in such contract, the policy surrendered by the insured was based upon the assessment, or flexible premium, plan of insurance and the policy received by him in lieu thereof was based upon the legal reserve, or fixed premium, plan of insurance, and where, in such contract of substitution, the insured signed a separate writing, acknowledging an indebtedness in the form of a "loan" to be a lien upon the new policy as security for the same, on account of assessments against him under the old policy, the policy and the separate writing are parts of a single contract.

(b) Where, in such case, the insured is unable to read because of defective eyesight, and the insurer, upon whom he rightfully relies for information, represents to him, without mentioning any fact disclosed by such separate writing, that upon his death the amount specified in such new policy will be paid, such representation is false, in that it is not qualified by information to the insured that the obligation to pay under the new policy is subject to the provisions of said separate writing.

(c) Where, in such case, the insured, in ignorance of the character of such separate writing, enters into such contract of substitution and signs such separate writing in rightful reliance upon such false representations as to the contract as a whole, he is entitled to a rescission of the same as fraudulent under the provisions of section 892, Stats. 1890 (section 984, Rev. Laws 1910), in view of the character of such contract and the opportunities it afforded for his signature to writings appropriate to the same, notwithstanding his inability, for want of memory, after a lapse of about ten years, during which he believed such contract, as a whole, was as so represented to him, to allege what additional representations more immediately and specifically directed to such separate writing and to his act of signing the same, were made to him, except that he alleges that they were false and fraudulent and, in effect, that they were not inconsistent with and did not qualify the aforesaid false representations as to the contract as a whole.

(d) Since it is not essential to plaintiffs'

right to rescind in such case 'under said section of the statutes that they allege all the false and fraudulent representations made to the insured as inducement to the execution of such contract, it is reversible error to sustain a general demurrer to their petition, alleging, in effect, the foregoing false and fraudulent representations, and suppression of facts, for want of allegations of what additional affirmative fraudulent representation more immediately and specifically directed to such separate writing induced the insured to sign the same.

(e) A petition for such rescission, filed on November 15, 1915, and alleging the foregoing facts, and further showing that on March 7, 1914, the defendant, to whom said new policy had been sent to enable it to indorse thereon the fact of a certain loan of that date upon the security of such policy, at the same time indorsed upon said policy the fact of the indebtedness and lien evidenced by the aforesaid separate writing, and further, that plaintiffs did not have actual knowledge of the latter fact until January 24, 1915, does not show such laches as to be vulnerable to a general demurrer upon that ground.

(f) Under the facts shown above, equity will not require an offer by the plaintiffs to compensate the insured for the time he has had the protection of the policy issued in such fraudulent contract to entitle them to a rescission.

(g) The recitals in such new policy that the same is in consideration "of the payment in advance of $317.20 and of the payment of a like amount on or before the 24th day of January and every year thereafter until premiums for twenty years were duly paid or until the prior death of the insured," and that said policy was granted of a date nine years prior to its issuance, and, further, that such premium should be paid for 11 years only, and that the premium period would end on a specified date 11 years after the issuance of such policy, although apparently inconsistent in this respect, are not constructive notice to the insured that the surrender of such old policy and the promise to pay 11 premiums of $317.20 are not the sole consideration for the same.

## 2. Same—Petition—Prayer for Relief.

A petition, based upon fraud in a substitution of one for another contract of life insurance, which alleges facts entitling the plaintiffs to no relief other than an equitable rescission of such contract, will be deemed sufficient to show plaintiff's right to the same, notwithstanding the prayer is for "the sum of $6,659.06, the items going to make up this sum being the alleged value of policy No. 58303, together with interest thereon from January 24, 1905, and the several annual premiums paid on policy 167821, with interest thereon from the dates of payment," * * * and for "the further sum of $5,000 as exemplary or punitive damages," for costs of suit, and "for all other proper relief."

(a) The prayer for relief is not conclusive as to the character of the petition nor as to the relief that the plaintiffs may be allowed to recover.

## 3. Cancellation of Instruments — Adequate Remedy at Law.

While courts of equity will not grant a rescission of a contract for fraud when the legal remedy for the same is plain, adequate, and complete, it will grant such relief where the legal remedy does not appear, in all respects, as satisfactory as the relief that may be furnished by a court of equity, as, for instance, where it may grant more complete relief by compelling the cancellation or surrender of the instrument fraudulently obtained.

Turner, J., dissenting.

Error from District Court, Oklahoma County; Edward Dewes Oldfield, Judge.

Action by James K. Myler and Eletha Myler against the Fidelity Mutual Life Insurance Company of Philadelphia. Judgment for defendant, and plaintiffs bring error. Reversed and remanded with instructions.

E. G. McAdams, Norman R. Haskell, and George L. Kelly, for plaintiffs in error.

Burwell, Crockett & Johnson, for defendant in error.

THACKER, J. The plaintiffs in error bring this case here for a review of a judgment against them as plaintiffs in the trial court upon the sustention of a general demurrer filed by the defendants in error to the allegations of their petition.

We deem it unnecessary to set out at length the allegations of the petition; but these allegations, in so far as they are important to be understood in determining the questions presented for decision here, may be stated according to their effect, as follows: That on January 24, 1905, James K. Myler held a policy of life insurance, numbered 58303, then of the value of $2,392.76, payable at his death to Eletha Myler, his wife, or in the event of her prior death to his administrators, executors, and assigns, for $5,000, which had been issued by the Fidelity Mutual Life Association, of Philadelphia, an association organized and operating upon what is known as the assessment, or flexible premium, plan of insurance, on April 30, 1895, and calling for a premium of $145.90 per annum, then aggregating $1,459, which the insured had paid as they became due; that said policy No. 58303, among other things, provided:

"The premium payable hereunder the first policy year, less the actual mortality cost, and any savings in the contributions to the mortality fund, as specified in the body of this policy, during the next four years, shall belong to the general fund of the association, and thereafter such saving, if any, shall in-

ure to the benefit of the member, and any deficiency in the mortality fund shall be made good out of the equation fund, which shall be deemed and regarded as a surplus of the association.

"Safety Clause . If a deficiency shall at any time occur in the equation fund (which shall at no time be less than the sum of one periodical payment by all the members, and not less than $1,000.00, the purpose of which is to equalize the increasing mortality cost due to advancing age), or if the proportion of such fund properly belonging to this policy shall be at any time not equal to the difference between the present worth of the future payments and sum insured, according to the tabulated insurance experience of the past computed at 4 per cent. per annum, then the member shall be liable for the deficiency. Such deficiency shall be made good by the payment by every member of the association of his pro-rata share of the same, as provided in the by-laws, within thirty days from the date of notice of same, or with the consent of the directors the amount thereof, together with interest at the rate of 6 per cent. per annum, may be charged against the member's policy and deducted therefrom when it becomes a claim. It is understood that the said association is purely mutual, is not required by law to value its policies or maintain a legal reserve, but grants the insurance on the flexible premium plan.

"After seven years, and while still in force, this policy if legally surrendered, may be exchanged for a commuted policy, payable at death out of the equation fund, for such a sum as 80 per cent. of the member's unexpended payments to said fund, on the basis of the Actuaries' or Combined Experience Table of Mortality, and interest at 4 per cent. will purchase: Provided, always, that all death losses that have occurred under original policies shall first be paid or preferred."

That on said January 24, 1905, James K. Myler was not liable to an assessment under the terms of said policy to the amount of $2,060 on account of inadequacy of the $145.90 per annum premiums charged and of the consequent necessity of assessments by said association, and he was not advised and the plaintiffs had no knowledge of the fact of any claim of such, or any assessment or accrued liability thereto. That on January 24, 1905, James K. Myler, 58 years old, was unable to read because of defective eyesight, and in entering into a contract with the defendant on that date had a right to rely, and relied, upon the latter as to the character and contents of the writings evidencing the contract. That the said contract of January 24, 1905, was one in which James K. Myler surrendered said policy No. 58303 and agreed to pay a specified premium, to the defendant, an insurance company organized and operating upon the legal reserve and fixed premium plan, and as the successor of the aforesaid

association, and in consideration thereof took from the defendant its policy No.167821 for $5,000, plus, in the event of his death within 20 years, certain guaranteed additions, gradually increasing with each succeeding year so that the addition of the twentieth year would increase the amount to be paid under the terms of this policy to the amount of $9,250. That the premium called for by this policy No. 167821 was $317.20 per annum for 11 years from January 24, 1905, so that the premium paying period would end on January 24, 1916, although this policy recited that it was granted as of date on January 24, 1896, "in consideration of the application herefor, which is made a part hereof, and of the surrender and cancellation of policy No. 58303, issued by the Fidelity Mutual Life Association, now the Fidelity Mutual Life Insurance Company, and of the payments in advance of three hundred seventeen and 20/100 dollars, and of the payment of a like amount on or before the twenty-fourth day of January in every year thereafter, until premiums for twenty years have been duly paid, or until the prior death of the insured." That as a part of the contract of January 24, 1905, James K. Myler, without knowledge of any liability to the association or to the defendant, and without knowledge of the contents or true character of the instrument next mentioned, signed a so-called "certificate of loan," which the defendant retained, and which reads as follows:

"This certifies that the Fidelity Mutual Life Insurance Company, of Philadelphia, Penna., has loaned on policy No. C-167821, the sum of two thousand and sixty dollars, which with any additional loan, shall be a lien on said policy until paid; simple interest at the rate of six per cent. per annum to be added thereto until the end of the distribution period of said policy, at which time the profits accruing to it shall be used toward the payment of said loan, and any excess paid in cash or used as set forth in the policy, at the option of the insured. Should the profits not fully pay the lien, the amount remaining unpaid at that time may be continued as a loan with interest as aforesaid, and the dividends accruing on the policy, to be thereafter payable annually. In event of my death or failure to make any payment when due to said company before said loan is fully paid the amount remaining unpaid shall become due and be deducted from the amount payable under said policy. Dated at Caldwell, O., January 24, 1905. James K. Myler, the Insured. Witness: E. C. Layton."

That as inducement to the contract of January 24, 1905, evidenced by said policy No. 167821 and said "certificate of loan," the defendant falsely and fraudulently repre-

sented to James K. Myler, and the latter believed, and acted upon the belief, that upon his death it would pay the beneficiary under this new policy No. 167821 $5,000, plus said guaranteed additions, without informing him of the facts evidenced by said "certificate of loan" or of any character of qualification of the defendant's obligations to pay as specified in said policy. That James K. Myler would not have entered into said contract, evidenced by said policy No. 167821 and said "certificate of loan," if he had had any information or knowledge of any claim by defendant against him of the indebtedness evidenced by said "certificate of loan." That plaintiffs had no knowledge of such indebtedness or of any claim thereof until January 4, 1915, although on March 7, 1914, James K. Myler borrowed of the defendant $296.83 upon the security of said policy No. 167821 and sent this policy to the defendant so that it might indorse the fact of such loan upon it, and it was returned to him bearing, in addition to such indorsement, the following separate indorsement: "This policy is also subject to a premium lien of $2,060.00 with interest." That prior to March 7, 1914, said policy No. 167821 bore no evidence whatever that the same was subject to a premium lien of $2,060 with interest, nor to any other lien or set-off, but was in accord with the aforesaid false and fraudulent representations, inducing him to enter into the contract of January 24, 1905; that, about nine years and two months having elapsed between the execution of said contract of January 24, 1905, and the said indorsement on said policy, and about ten years having elapsed between said contract of January 24, 1905, and the first actual knowledge the plaintiffs, or either of them, had of such certificate of loan, James K. Myler was and is unable to remember, and does not know, what representations were made to him, except those already stated as to the effect of the contract as a whole, which induced him to sign said "certificate of loan," although he does know that they were false and fraudulent, inasmuch as he would not have signed the same if he had understood that it qualifies, as it does, the terms of the contarct as he understood them from the hereinbefore stated representations to him. That Eletha Myler never knew what, if any, representations were made to James K. Myler as such inducement to such signing. That upon said policy No. 167821 there is an application for the same also signed by the said James K. Myler, and that said policy No. 167821 is tendered into court for delivery to the defendant, and the plaintiffs offer to allow in this case a deduction of the amount

of said loan of $296.83, with interest thereon, from the amount of their recovery herein.

The petition prays for judgment for "the sum of $6,659.06, the items going to make up this sum being the alleged value of policy No. 58303, together with interest thereon from January 24, 1905, and the several semi-annual premiums paid on policy No. 167821, with interest thereon from the dates of payment," and for "the further sum of $5,000, as exemplary or punitive damages," for cost of suit, "and for all other proper relief."

It may here be observed, as shown by the case of Anderson v. Muhr, 36 Okla. 184, 128 Pac. 296, that the prayer of the petition is not conclusive of the character of the relief to which the plaintiff is entitled; and since the plaintiffs do not show that they actually rescinded the contract in question before they commenced this action, this must be regarded as a suit in equity for a rescission of the same, notwithstanding the prayer is for different relief. It may also be here observed, as shown by the case of Summers v. Alexander, 30 Okla. 198, 120 Pac. 601, 38 L. R. A. (N. S.) 787, that:

"One to whom a distinct and definite representation has been made is entitled to rely on such representation, and need not make further inquiry concerning the particular facts involved."

If this policy, No. 167821, and this "certificate of loan," were separate and distinct contracts, so that the alleged false and fraudulent representations made by the insurer as to the terms of its obligations under the contract of January 24, 1905, should not be regarded as affecting the certificate, or if, notwithstanding this policy and this "certificate" are parts of a single contract, according to the allegations of the petition, these representations should be regarded as relating only to this policy instead of to the entire contract, including said certificate, it should require neither argument nor authority to show that these representations could neither be regarded as fraudulent, nor as false, nor as contributing to relieve the insured from negligence in signing this "certificate," nor as any part of the inducement to his signature.

But this policy and this "certificate of loan" must be regarded as merely parts of a single contract and said representations as referring to said contract as a whole; and, when so regarded, these representations were false, in that they not only omit to mention, but impliedly negative the existence of such "certificate of loan" and of the indebtedness evidenced thereby, and they were fraudulent in that they were cal-

culated to distract the attention of the plaintiff and prevent him from discovering the truth, and were not only intended by the defendant, but were reasonably and properly understood by James K. Myler, as indicating that the obligations assumed by the defendant in issuing this policy were unqualified, and that James K. Myler was not liable, or, if so, would by this new contract be discharged from liability on account of any assessments under the old policy, notwithstanding he signed said certificate. In 2 Mod. Am. Law, 206, 207, in a discussion of tort liabilities, it is said:

"The words used may be literally true, but if the impression which the statement, as a whole, creates is not true, the representation is false. Partial withholding of facts will often render a statement false; if the defendant suppresses a material fact, and such suppression renders what he has said untrue, or causes it to convey, as a whole, a false impression, he is liable."

This rule must necessarily be equally applicable where the action, as here, is a suit for a rescission of a contract instead of an action for damages for the tort.

It is beyond question, of course, that there is no contract where the minds of the parties do not meet in agreement upon its terms, unless a party signing the same is estopped by his negligence from denying that their minds did meet in such agreement. 6 R. C. L. Contracts, sec. 54, p. 638. In 12 R. C. L. Fraud and Deceit, sec. 98, p. 343, it is said:

"False representations made with knowledge of their falsity, or with intent to deceive, or with what is regarded in law as equivalent to knowledge, are, of course, such fraud as will authorize a rescission of a contract. But many courts · lay down the rule that the misrepresentation of a material fact may be ground for rescinding or avoiding a contract, though there is no actual fraud, and though it is innocently made. Such a representation is· considered to be constructively fraudulent because of its effect of imposing on and deceiving the person to whom it is made. This rule has often been applied in actions at law to recover back property sold, or the price paid for property purchased. It is also applied where it is sought to rescind by a suit in equity brought for that purpose, and in some states, where fraud is interposed, as a defense in an action on a contract. Some courts hold that knowledge must be shown in order to rescind the contract at law, as, for ·example, where it is sought to recover back property sold on the ground of fraud, or where fraud is interposed as a defense in an action on the contract. It has also been held that the rule that false representations are ground for rescission, though innocently made, must give way to

the rule of caveat emptor in cases where that rule would otherwise apply."

This brings us directly to the question as to whether, under all the facts and circumstances alleged in the petition, James K. Myler, in signing the "certificate of loan" without knowledge of its contents, was guilty of such negligence as to estop him from showing that he did not assent to the terms thereof and from asserting his right to a rescission of the contract in question. Of course, as stated in 10 R. C. L. Equity, sec. 69, p. 326, "it is a general principle that courts of equity will not relieve a party from the results of his own carelessness, negligence or laches not induced by the conduct of the other party," but it does not appear from the petition under consideration that plaintiffs have been guilty of such carelessness, negligence, or laches, not induced by the conduct of the other party, as to defeat their right to an equitable rescission. In Chisum v. Huggins et al., 55 Okla. 423, 154 Pac. 1146, it was held:

"A contract obtained by the fraudulent representations or conduct of one of the parties thereto should not be enforced, if it satisfactorily appears from the evidence that the party seeking a rescission has been misled in regard to a material matter by such misrepresentations or conduct to his injury; and it matters not that the party so misled may have been, in some degree, negligent, for it is not just, nor equitable, for a person who has deceived another to * * * shield himself from the consequences of his own misconduct behind the faith and confidence reposed in him by his victim."

In Summers v. Alexander, supra, it was said in the opinion:

"Where it is sought to enforce a contract, and a plea of fraud is interposed, the defense will be sustained, even though the defendant may have been wanting in ordinary prudence in relying on the representations of the other contracting party as to the tenor or contents of the writing; the rights of innocent parties not intervening. They might still insist that it was not their contract."

It is true that neither the Chissum nor the Summers Case, supra, are suits for rescission, and it is the question of fraud as a defense to an action upon a note that is considered and determined in each of those cases; but the questions appear to be sufficiently analogous to justify the quotations we have made above. And in 1 Elliott on Contracts, sec. 73, pp. 107-110, it is said:

"As a general rule the mind must accompany the act of signing a contract in writing. If one is induced to sign an instrument by a fraudulent reading or statement of its contents or substance, unmixed with any fault or negligence in himself or his agents, and he believes he is assenting to a contract of dif-

ferent import from that which he actually signs, he is not bound. It makes no difference whether such misstatement or misreading of the contents or substance was made by the party who seeks to enforce the obligation or by a stranger who acted for him. Thus far all authorities agree. They also agree that if one to whom the instrument is falsely read, or its contents misstated, is on an unequal footing with the party who made the instrument or makes the statements as to its contents, he is not guilty of negligence in signing the instrument because of a rightful reliance on such party. So when the party defrauded by such means is illiterate and unable to read, reads with difficulty, has defective eyesight, or cannot understand the language in which it is written. Some courts lay down the rule that the carelessness or negligence of a party in signing a contract does not estop him from afterward setting up that it does not contain the true agreement of the parties, in a suit thereon between the original parties to such contract, or their privies, where the party seeking enforcement practiced fraud or deception in order to induce the other to sign. The rule laid down by the foregoing cases seems correct in principle, for if one signs an agreement, relying on the statement of the other party as to its contents, which statement proves false, the contract should be voidable as between the parties or their privies, for the defrauded party should not be permitted to take advantage of his own wrong, or to say that the other party was negligent in believing him. A majority of the courts take this view of the subject. This rule, however, is not universal. Other courts hold that if the defrauded party could read, or if by the exercise of reasonable diligence he might have discovered the deception, he is bound by the contract, his own negligence defeating his right to avoid the agreement. But on examining the above cases it will be found that they, in the main, give illustrations of gross negligence on the part of the party defrauded, while on the other hand, little, if any, actual fraud was practiced by the adverse party. Thus in one of them the facts showed that plaintiff's agent, who solicited an order for a certain article from defendant, did nothing whatever to induce him to sign the order without reading it, no false representations as to its contents were made, but the agent simply, silently, rapidly, and somewhat illegibly wrote the order with a pencil, and then silently placed it immediately and quickly before the defendant, who signed the same without reading it. In another it appears that the signer was a highly educated man, and that the instrument sought to be avoided consisted of one sentence of three lines, legibly written, so far as appears, and that the part which was claimed to have been fraudulently inserted was in the last line and immediately above his signature."

It will be observed in the above quotation from Elliott on Contracts that it is stated that all authorities agree "that if one to whom the instrument is falsely read or its contents misstated is on an equal footing with a party who reads the instrument or makes the statements as to its contents, he is not guilty of negligence in signing the instrument because of a rightful reliance on such parties," and, further, "so when the party defrauded by such means is * * * unable to read, reads with difficulty, has defective eyesight, or," etc. Assuming that the author did not intend to say "is not on an equal footing" instead of "is on an equal footing," the reason for this rule is obviously stronger when he is on less than an equal footing.

Where the contract, being one of insurance and involving a change therein, is intrinsically fiduciary, and necessarily calls for perfect good faith and full disclosure on the part of the insurer (2 Pomeroy's Equity Jurisprudence, secs. 901, 902) as here, there is no room for question of the obligation of the insurer to have fully informed James K. Myler of its claim of an assessed indebtedness against him to the amount of $2,060, and that the obligations of the defendant under this policy No. 167821 were qualified by the provisions of the "certificate of loan" transforming an assessed indebtedness under the old policy, which is surrendered, into a loan under the new policy, which loan is to be a lien upon the latter policy and may be offset against the same.

It is true that one who relies upon fraudulent representations to relieve himself from the obligations of a written contract to which he has attached his signature must be able to allege and prove the facts constituting the grounds of such relief; and his inability to remember does not relieve him of any burden placed upon him by the law, but merely renders him unable to allege and prove and thus establish his right to such relief, unless he can obtain the information which will enable him to make such allegation and produce the evidence to make such proof from some source other than his own memory; but it is not and should not be always necessary that he should be able to allege and prove all of the false and fraudulent facts which may have been represented to him, and which may have contributed to induce him to sign such contract. In 2 Mod. Am. Law, p. 203, it is said:

"In some particular transactions and special relations, notably in fiduciary relations, wherever confidence is reposed and accepted, there is an affirmative duty upon the one party to disclose to the other **all he knows** regarding the subject-matter of the relation or transaction. A failure to make such disclosures is a fraud." (Emphasis is ours.)

And this brings us to the precise question as to whether the plaintiffs can show themselves entitled to relief from the "certificate of loan" in question without being able to specify what representations were made to James K. Myler as inducement to him to sign this certificate other than the false and fraudulent representations relating to the contract as a whole, together with the suppression of the truth as to the contents and true character of the certificate.

The petition does not allege that during the time and as a part of the execution of the contract of January 24, 1905, the insurer told the insured to "Sign here," or "Sign there," or "Sign this agreement to surrender your old policy," or "Sign this policy," or "Sign this receipt for the policy," or what, if any, representation was made to the insured specifically referring to his act of signing this certificate; and the weak point in this petition is its failure to specifically allege all the facts in this regard; but it seems to be fairly inferable from the allegation of the petition that he must have understood this certificate of loan as a part of or consistently related to the contract represented to him, so that the representations made to him may be understood as relating to this certificate as we have hereinbefore stated. When so understood, it appears to us that this petition should be held sufficient as against a general demurrer.

It is not difficult to understand how one who is unable to read because of defective eyesight might be easily induced to sign such certificate in the belief that he is signing some part of the contract represented to him or some writing consistent therewith and appropriate thereto, and how, after a lapse of 10 years, he might be unable to remember what particular writing he thought at the time he was signing, or how he was induced to sign the same, except that the entire contract was represented to him as he alleges, and he signed in total ignorance of the true character of the writing and of any indebtedness thereby evidenced.

It is not difficult to understand how James K. Myler might have signed this writing in the belief that he was signing one evidencing his surrender of the old policy or his receipt of the new, or both, or some other equally appropriate writing in accord with the contract represented to him, without being able to remember as to this; and, since he does remember and alleges sufficiently material false and fraudulent representations contributing as here shown to induce him to sign, he should be allowed to make his proof if he can.. The character and contents of the contract, as a whole, into which he was entering were falsely and fraudulently misrepresented to him, according to the allegations under consideration; and, since it appears from these allegations that this was a material contributing cause of his signature, the fact that the character of the contract and of the writings evidencing the same are reasonably calculated to suggest additional representations which are not alleged, and that the petition shows a belief on the part of the plaintiffs that there were some additional false and fraudulent representations directed more immediately to James K. Myler's act of signing and referring more specifically to the "certificate of loan," which, after a lapse of 10 years he is unable to remember, and which plaintiffs are therefore unable to put forward as a ground for the relief sought, except to allege that such additional representation bore no information as to the contents or true character of this certificate or as to the indebtedness thereby evidenced, should not be allowed to defeat their right to a rescission of the contract under all the facts and circumstances alleged, including the fiduciary relationship of the defendant to the insured at the time of the contract of January 24, 1905. In the case of Mutual Reserve Life Insurance Co. v. Foster, 19 The Times L. R. 342, affirmed on July 29, 1904, by the British House of Lords, 20 The Times L. R. 715, the representations which were deemed false and fraudulent and sufficient to justify a rescission of an insurance contract that was characterized as difficult to understand and "tricky" and "deceptive" in its wording perhaps bore as strong a resemblance to the truth as the representations relied upon by plaintiffs in the instant case, and the insured, being apparently not only able to read, but a learned lawyer, was not so free from negligence as the insured in the instant case. To quote from the brief in behalf of the plaintiffs in error:

"The material facts of the case were these: On January 17, 1891, the respondent Foster entered into a contract of life insurance with the appellant, which was then called the Mutual Reserve Fund Life Association, and was a corporation created under the laws of New York with an office and place of business at London. He was induced to take this policy by a representative of the company named Bridgman, who represented to him that, owing to its method of doing business, the company was able to insure at about half the cost of English offices; that a policy for £5,000 would cost him £70 per annum only. During the course of the negotiations Bridgman furnished Foster with certain pamphlets, reports, and tables of mortuary rates, which were to be payable

on the first week day of every second month. Neither Bridgman nor the papers furnished by him disclosed the fact that these mortuary calls or premiums were liable to increase with the increase of age. Acting upon the aforesaid representations Mr. Foster insured in the amount of £6,000. Indorsed upon the policy which was issued to him was a table of mortuary calls purporting to show the maximum rate per £100 of insurance payable by each member according to his age. The policy was so worded as to permit the assessment of members according to their ages at the time of the calls, and at the same time to create the impression that members were liable to pay only the maximum rates for their respective ages at the time of the issuance of the insurance. For seven years Mr. Foster was called upon to pay mortuary calls not exceeding in amount the maximum rates for his age at the time he became a member, viz., 36 years. On February 1, 1898, however, the company demanded of him the payment of a rate substantially in excess of the maximum rate for his age at the time of insuring; and on October 1, 1899, payment at a still higher rate was demanded. Mr. Foster having objected to these calls, the company asserted its right to make mortuary calls (upon the first week day of every second month) not exceeding the maximum amount stated in the table indorsed on his policy according to his age at the date when the call was made, and not at the date when the policy was issued. To prevent the forfeiture of his policy and under protest and preserving all his rights, the respondent paid the sum of £68 7s. 6d. in excess of the amount he was liable to pay according to his contention. The dates of these payments are not stated in the report, but calculations based upon the amount of his excess and the increases in rate indicate that Mr. Foster paid the increased mortuary calls on the first day of every second month from February 1, 1898, until about the last of the year 1900. The date of the commencement of the action is not stated in the report, but the report of the case in the Court of Appeal, 19 The Times Law Reports, 342, shows that it was tried in the nisi prius court in July, 1902. The relief sought was that the policy be adjudged to require mortuary calls to be based upon the age of the insured at the time of the issuance of the insurance, and that the difference between the amounts paid by the insured and the maximum rates for his age at the time of insuring should be refunded to him, or, in the alternative, the rescission of the policy upon the ground that it had been represented to him that by the terms of the policy he would be required to pay no more than the maximum rates for his age at the time of insuring, whereas the policy in fact required him to pay such rates based upon his age at the time of the call.

"In the trial court Mr. Justice Kekewich held that by the terms of the policy the insured was only required to pay the maximum rate for his age at the time of insuring, that, therefore, the policy had not been misrepresented to him, but that he had been overcharged. Judgment was rendered in favor of the plaintiff for the said sum of £68 7s. 6d. The Court of Appeal (Collins, M. R., Romer and Cozens-Hardy, L. JJ.) reversed this judgment, holding that the policy did permit mortuary calls at the rate prescribed for the age of the insured at the time of the calls, but that since it had been represented to the plaintiff that under the policy he was liable to pay only the maximum calls based upon his age at the time of insuring, he was entitled to rescind and recover back the amount of all calls paid by him from the very beginning, together with interest thereon from the times of payment (the same relief demanded by plaintiffs in error in this case). This judgment of the Court of Appeal was affirmed in the House of Lords (Earl of Halsbury, L. C., Lord Macnaghten, and Lord Lindley) on July 29, 1904. We quote the report of the opinions of the Lord Chancellor and Lords Macnaghten and Lindley: 'The Lord Chancellor, in moving that the appeal be dismissed, said that there were one or two questions raised which might be summarily dismissed. The first was the nature of the document tendered to Mr. Foster, which the Court of Appeal had described as "tricky." His lordship concurred in that description. After three days' elaborate exposition their lordships had at last arrived at what the real meaning was. There had been great ingenuity in concealing the real effect of the contract. It was not necessary to go through the whole of the evidence. But when one observed the mode in which at one particular period of life the list of ages stopped, and when one noticed that the language which was used was undoubtedly of an ambiguous character—he doubted very much whether that ambiguity was not intentional—the result of his lordship's mind was that beyond all doubt this was a document which any one, even a skilled person, would be unable to understand without very careful and elaborate explanation. It was clear to his mind that Mr. Foster did not understand it, and that he thought that upon the true construction of the policy, such as it was, he was entitled to keep up his policy on the original rates without subsequent increase. In these circumstances his lordship was of the same opinion as the Court of Appeal—that Mr. Foster was entitled to the relief which he claimed. His only difficulty was with respect to the argument last raised by Mr. Upjohn—on the point of delay. Undoubtedly there had been considerable delay, and the passages cited from the judgments of Lord Cairns were entitled to the greatest possible attention and respect. But the question what was a reasonable time was inextricably involved in the nature of the transactions. Here Mr. Foster had a policy which, he naturally was not inclined to surrender, preferring to insist on his rights under the policy. Thus he was placed in a somewhat awkward position pending his ascertainment of those rights. His lordship admitted the cogency of Mr. Upjohn's observations on

this part of the case, but in the difficult circumstances of the case he did not think it was too late for Mr. Foster to make his complaint. Lord Macnaghten, in expressing his concurrence with the judgment moved, said that he had also been impressed with the argument founded on delay, but in the circumstances he did not think that delay was fatal. Lord Lindley said that the case had been presented to their lordships with great ability, skill, and fairness. Mr. Haldane had with great ingenuity avoided the real point of controversy, whilst he insisted upon the great advantages and the soundness of the principles of the appellants' system of insurance. Then, and not before, he called attention to the documents which induced Mr. Foster to enter into the contract. But without that preliminary explanation his lordship did not think that any ordinary intelligent Englishman would have understood the documents placed in Mr. Foster's hand in any other sense than that in which Mr. Foster understood them. His lordship was perfectly satisfied that he should have understood them exactly as the respondent had understood them, and in his opinion the Court of Appeal had not gone too far in characterizing these documents as tricky and deceptive. The most formidable argument was that which was founded on the respondent's delay, but in the difficult circumstances in which he was placed he concurred with his noble and learned friends in thinking that the delay did not deprive Mr. Foster of the relief which he sought. "

It is argued in effect that the consideration expressed in policy No. 167821 "of the payment in advance of $317.20 and of the payment of a like amount on or before the 24th day of January and every year thereafter until premiums for twenty years were duly paid or until the prior death of the insured," together with the fact that this policy was granted of January 24, 1896, when James K. Myler was nine years younger, although it expressly provided that such premium should be paid for 11 years only, and that the premium period would end on January 24, 1916, was constructive notice to him that this premium for each of the nine years prior to the contract of January 24, 1905, was to be paid in some way other than by mere surrender of policy No. 58303.

But, although this peculiarity in the provisions of policy No. 167821 may have been sufficient to excite a question in the mind of a critical lawyer, it cannot be said as a matter of law that the average person in the position of James K. Myler would not be justified in believing, as we must assume he did, that the surrender of a policy No. 58303, which he values at $2,392.76 at that time, was the only and a sufficient consideration for the omission of any other provision for the payment of the nine omitted premiums

suggested by the provision for the payment of $317.20 "until premiums for twenty years were duly paid or until the prior death of the insured."

And, then, too, in view of the fiduciary relationship between the insurer and the insured, if any other view be taken of the contract of January 4, 1905, than that the 11 premiums called for, together with the surrender of policy 58303, were the sole and sufficient consideration for policy No. 167821, the provisions just mentioned in this latter policy would seem inconsistent, if not, as was said of the policy under consideration in the case of Mutual Reserve Life Insurance Co. v. Foster, supra, "tricky" and "deceptive." We do not think the petition vulnerable at this point to an attack by general demurrer.

It is also argued that plaintiffs in asking a rescission of the contract of January 24, 1905, more than ten months after they had actual knowledge of the fraud they allege, and about 20 months after the indorsement upon policy No. 167821 of the fact of defendant's claim of the indebtedness and lien evidenced by the "certificate of loan," are guilty of such laches as to defeat their right to an equitable rescission; but, in view of all the facts alleged in the petition, we are unwilling to say that the same is not sufficient in this respect as against a general demurrer. In 6 R. C. L. Contract, sec. 317, p. 935, it is said:

"Where it would be practically unjust to give a remedy, either because the party has, by his conduct, done that which might fairly be regarded as equivalent to a waiver of it, or where by his conduct and neglect he has, though perhaps not waiving that remedy, put the other party in a situation in which it would not be reasonable to place him if the remedy were afterwards to be asserted, lapse of time and delay are material. Two circumstances, always important in such cases, are the length of the delay and the nature of the acts done during the interval, which might affect either party and cause a balance of justice or injustice in taking the one course or the other, so as relates to the remedy."

And in 3 Elliott on Contracts, sec. 2431, p. 588, it is said:

"A person cannot be deprived of his remedy in equity on the ground of laches, unless it appears that he had, or ought to have had, knowledge of his rights. * * * If the delay is unreasonable, and the adversary party has changed his position so that he cannot be placed in statu quo, rescission will be denied. But an alteration in position not affecting substantial rights does not, of itself, prevent rescission. A number of opinions of eminent jurists would seem to excuse any delay less than the period of statute of limita-

tions which has not operated to the prejudice of the defendant. But relief by way of cancellation has been given regardless of unexplained delay on the plaintiff's part, amounting in some instances to several years."

It may be easily understood how it may have required considerable time for plaintiff to determine his rights and to choose between the alternatives which confronted him upon the discovery that he had signed such a "certificate of loan," and it does not appear from the petition that defendant so altered its position in the meantime as to render a rescission inequitable.

It is also argued that the plaintiffs have an adequate remedy at law, and that their asserted right to an equitable rescission should be denied for this reason.

(a) In 4 R. C. L. Cancellation of Instruments, sec. 5, p. 491, it is said:

"Accordingly equity will not decree the cancellation of a written instrument when the legal remedy by an action or defense is plain, adequate, and complete. This principle is subject to the qualifications, however, that to exclude the equitable jurisdiction, the legal remedy must be, in all respects, as satisfactory as the relief furnished by a court of equity. Accordingly, while it is generally held that fraud in the procurement of a contract is not of itself sufficient to take a case out of the rule, it is equally well settled that chancery will exercise its concurrent jurisdiction where it may grant more complete relief by compelling the cancellation or surrender of the instrument fraudulently obtained." 24 Am. & Eng. Ency. of Law (2d Ed.) 614.

But in Howe v. Martin, 23 Okla. 561, 102 Pac. 128, 138 Am. St. Rep. 840, it was held:

"A person induced by false and fraudulent representations to purchase or exchange for property has three remedies. He may, first, upon discovery of the fraud, rescind the contract absolutely, and sue in an action at law, and recover the consideration parted with upon the fraudulent contract, and in such a case he must restore, or offer to restore, to the parties sued whatever he has received by virtue of the contract; or, second, he may bring an action in equity to rescind the contract, and in such a case it is sufficient to plaintiff to restore, or make offer in his petition to restore, everything of value which he has received under the contract; or, third, he may affirm the contract, retain that which he has received, and bring an action at law to recover the damages sustained by reason of his reliance upon the fraudulent representations."

It is argued that plaintiffs' petition is insufficient to entitle them to rescind because it does not offer to do equity by allowing defendant to retain reasonable compensation as premiums for the nine years during which they had the benefit of protection under the policy; but this protection was an incident of the fraud alleged by them, involving no financial benefit to plaintiffs or loss to the defendant. The case of Summers v. Alexander, supra, tends in some degree to negative this argument; and in the case of Kettlewell v. Refuge Assurance Co., 1 K. B. 545, 3 British Ruling Cases, 844, the syllabus as quoted in the brief for plaintiffs in error reads as follows:

"By a policy of life insurance the defendants, in consideration of the payment by the plaintiff of a weekly premium, contracted to pay to the plaintiff a certain sum upon the death of a third person. After the policy had been on foot for a year the plaintiff proposed to let it lapse, whereupon the defendants' agent, with the view of inducing her to continue the payment of the premiums, falsely, and without the authority of the defendants, represented to her that if she continued paying the premiums for four more years she would be entitled to a free policy, that is to say, that, though the policy would remain in force, she would, on the expiration of that period, have no further premiums to pay. Relying on that representation she continued to pay the premiums for the further period of four years, but on the expiration of that period the defendants refused to give her a free policy. The plaintiff sued to recover back the premiums paid by her since the date of the false representation made.

"Held by Lord Alverstone, C. J., and Sir Gorell Barnes, President (Buckley, L. J., dissenting), that, the contract contained in the policy being under the circumstances voidable at the plaintiff's option, the fact that the defendants had, during the whole of the four years, been subject to a risk of having to pay the sum assured in the event of the life dropping during that period did not amount to a part performance of the contract, so as to bar the plaintiff from the exercise of her option to avoid it, and that the premiums consequently could be recovered back as money had and received to her use.

"Held, by Lord Alverstone, C. J., that the amount of the premiums could also be recovered as damages in an action of deceit.

"Held, by Buckley, L. J., that it could be recovered as money obtained for the defendants by the fraud of their agent."

The opinions of the Judges in that case, as also quoted in the same brief, read as follows:

"Lord Alverstone, C. J.: ' We all think that the judgment appealed from is right, but I am not sure that we are agreed as to our reasons. In this case the plaintiff, in February, 1901, effected a policy with the defendants under circumstances to which no exception could be taken, and for rather more than 12 months she continued to pay the premiums. In April, 1902, she was about to drop the policy, when a representation was made to her by one of the defendants' agents that if she went on paying for a cer-

tain time she would get a free policy, and a similar representation was made to her later by another of the defendants' agents. Those representations were untrue, and, relying upon them, the plaintiff was induced to continue payment of the premiums. Under those circumstances she claims to be entitled to recover back the premiums paid since April, 1902. Now, as a general rule, it is clear that where money is paid in reliance upon a fraudulent misrepresentation it can be recovered back. But it is said that that does not apply to policies of life insurance, because, inasmuch as the insurance company would not be allowed in an action on the policy to set up their own agent's wrong and allege that the policy was void, they must have been under a contingent liability to pay the sum assured during the whole time that the premiums were being paid and the policy was in existence, and that consequently, as they had been at risk during the whole of that time, the contract was no longer executory, and it was too late for the defrauded party to rescind. With that contention I cannot agree. In my opinion it is not right to speak of a mere risk of that kind which has not produced any benefit in fact to the assured, as being a part performance of the contract. I agree with the view that there is a state of things which arises in every case in which a contract is voidable, the one party being bound and the other not. I think this case is governed by the decision of the Court of Appeal in British Workman's and General Assurance Co. v. Cunliffe (1902) 18 Times L. R. 502. It is quite true that in that case the objection to the policy, namely, that the assured had no insurable interest, was one which made the policy void, and not merely voidable. But I think the principle of the judgment would equally apply to a case in which the fraudulent representation made the contract voidable only, because the assured would, in that case, be equally entitled to say that she would never have entered into the contract if she had known the truth. I am of opinion, therefore, that the plaintiff may recover back the premiums paid by her as money had and received to her use. I desire to add that the money can, in my judgment, be also recovered back as damages in an action of deceit, the measure of the damages in such an action being the amount of the premiums paid. It is contended, indeed, by Mr. Manisty, that an action of deceit would not lie under the circumstances of the case. In the first place, he said that the agent, in making the representation, was acting outside the scope of his authority. But there are a number of cases which show that, if the agent is there to do the business for the benefit of the principal, the principal is responsible for representations made by the agent in the course of the business. Then it was said that the representation was not one as to an existing fact, but a mere promise as to what would be done in future. But it seems to me that it was a statement as to the course of the company's business, according to which the payment of five years' pre-

miums was followed by a free policy. That is a statement of an existing practice, and therefore a representation as to a present existing fact. On both these grounds I think the plaintiff is entitled to recover back the premiums paid.'

"Sir Gorell Barnes, President: 'I am of the same opinion. I have nothing to add to what my lord has said on the question of the agent's authority. With regard to the other point, the way in which I regard the case is this: The policy was continuously binding on the defendants while it existed; they were liable as long as the assured went on paying the premiums. But the assured had an option; she might, if she chose, cease to pay the premiums, whereupon by the terms of the policy the policy would come to an end. Or she might from time to time renew it by paying the premiums. Now, the policy having been taken out, nothing of importance happened until after the policy had been on foot for a year. But shortly after the expiry of a year a representation was made to her, as a result of which representation she was induced to abandon her intention of letting the policy lapse, and continued to pay the premiums and thereby keep the policy alive. Some time afterward the representation was discovered to be false. And the question is, What are her rights in respect to the premiums which she had paid in consequence of the false representation? The first point made was that the representation was not a representation as to an existing fact, but I think it is quite clear that the representation amounted to a statement that, in accordance with the course of business of the defendants, there would be a free policy forthcoming at the end of five years. It was a representation as to the existing practice of the company. Then, the fraud having been discovered, the plaintiff elected to treat the policy as void from the time when she was induced to renew it by the misrepresentation, and the only answer to her claim to do so is that she cannot effectively rescind so as to entitle her to recover the premiums which had been paid on the basis of the false representation, because during the whole of the period which elapsed between the date of the misrepresentation and the election to avoid the policy the defendants have been under a contingent liability to pay the sum assured in the event of the life dropping. I am unable to take that view. It seems to me that in all cases in which a contract is voidable at the option of one party, the other party is under a liability until that option is exercised. The fact that such a liability exists will not affect the former party's right to declare the contract void. I am of opinion that the premiums which were so paid by the plaintiff can be recovered back as money had and received by the defendants to the plaintiff's use. I concur with the Lord Chief Justice in thinking that this appeal should be dismissed.'

"Buckley, L. J.: In my opinion the judgment below was right, but I do not agree

with the reasons given for it. The plaintiff was induced to pay premiums from April, 1902, to February, 1906, by untrue statements made to her by the defendants' agents that at the expiration of that time she would be entitled to a free policy. The result of that was that the contract of insurance was voidable at her option, but was not voidable at the defendants' option. During the time that she paid her premiums the company was at risk. If the life had dropped, and she had sued the company upon the policy, they would have had no defense. Under those circumstances it cannot lie in her mouth to say that she received nothing under the contract.. Valuable consideration had passed to her in the shape of a right to sue to enforce payment of the sum assured if a certain event had happened during the four years. In my judgment, therefore, it is impossible for her to sue for the money as money had and received to her use. Phillimore, J., in referring to Lord Ellenborough's ruling in Duffel v. Wilson (1808) 1 Campb. 401, uses a word which has the result of altering the whole effect of that decision. What Lord Ellenborough said—whether rightly or wrongly does not matter for the present purpose—was that there had been misrepresentation on the part of the defendant which rendered the contract void. If it were void, of course the money could be recovered. Phillimore, J., in citing that passage, substitutes the word "voidable" for the word "void," which makes the whole difference. But there is another ground upon which I think the plaintiff can succeed. It is well established by authority that a principal cannot retain a profit made by the fraud of his agent, whether the principal authorized the fraud or not. That is the doctrine that was laid down in Barwick v. English Joint-Stock Bank (1867) L. R. 2 Ex. 259, 36 L. J. Exch. N. S. 147, 16 L. T. N. S. 461, 15 Week. Rep. 877, 12 Eng. Rul. Cas. 298. This general doctrine was thus expressed by Lord Coleridge, C. J., in Swift v. Jewsbury (1874) L. R. 9 Q. B. 301, at page 312: "Justice points out, and authority supports justice in maintaining, that where a corporation takes advantage of a fraud of their agent, they cannot afterwards repudiate the agency, and say that the act which has been done by the agent is not an act for which they are liable." The ground upon which I think the plaintiff is entitled to recover here is that by the fraud of the defendants' agent she was induced to pay them sums of money which are now in their pockets, and are profit derived by them from the fraud. Of course, if the life had dropped and she had elected to affirm the contract, they could have retained the premiums, but then they would have had to pay her the sum assured. But the life did not drop, and on discovering the fraud she is entitled to say that they, having by their agent's fraud got her money into their pocket, cannot be allowed to keep the profit against her.'

"Appeal dismissed."

Section 892, Stat. 1890 (section 984, Rev. Laws 1910), in so far as applicable here, reads as follows:

"A party to a contract may rescind the same in the following cases only:

"First. If the consent of the party rescinding, or of any party jointly contracting with him, was * * * obtained through * * * fraud, or undue influence, exercised by or with the connivance of the party to whom he rescinds, or of any other party to the contract jointly interested with such party."

And in our opinion the general demurrer should have been overruled.

The judgment is reversed, and the cause remanded, with instructions to overrule the demurrer.

All the Justices concurring, except TURNER, J., dissenting, SHARP, C. J., absent, and KANE, J., not participating.